UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                          :
LOCAL 791, UNITED FOOD AND                :
COMMERCIAL WORKERS UNION, AFL-CIO,        :
     Plaintiff,                          :
                                          :
v.                                        :        Civil Action No. 05-10841-RCL
                                          :
SHAW'S SUPERMARKETS, INC.,                :
     Defendant.                          :
_____:

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION
## FOR JUDGMENT ON THE PLEADINGS

     Pursuant to Local Rule 7.1(B)(2), Plaintiff Local 791, United Food and Commercial

Workers Union, AFL-CIO ("Union") submits this opposition to Defendant Shaw's

Supermarkets, Inc. ("Company") motion for judgment on the pleadings.  As set forth below, the

Union's instant complaint should not be dismissed on the basis of lack of jurisdiction because the

terms of the collective bargaining agreement ("CBA") between the parties does not preclude the

Union from seeking relief in this Court.  Rather, pursuant to the plain and unambiguous terms of

the CBA, Plaintiff is only barred from submitting a violation of the parties 1985 Side Letter of

Agreement to arbitration, it is not barred from pursuing a violation in federal court under section

301 of the Labor Management Relations Act, 29 U.S.C. § 185 (section 301).

     In addition, the parties have other provisions in their CBA, covering health insurance,

disability benefits and pension benefits, that are also not subject to arbitration and the Company

has never suggested that violations of these provisions cannot be raised through an action in

federal court.  Indeed, the Union has previously brought an action for a breach of the health

insurance provisions in Article 10 of the CBA in the United States District Court, District of

Rhode Island, *Boule, et al. v. Shaw's Supermarkets*, Civil Docket No. 1:00-cv-00110-L, and the Company never suggested that the complaint should be dismissed on the basis of the court's lack of jurisdiction.   Rather, the Company defended against the Union's lawsuit solely on the merits.

Finally, to the extent the terms of the parties' CBA is ambiguous as to the Union's right to pursue a violation of the 1985 Side Letter of Agreement in this Court, that ambiguity can only be resolved by inquiring into the intent of the parties when they agreed that they could not arbitrate violations of the Side Letter.  Such an inquiry, as demonstrated by the attached affidavit of Mary McClay, the Union's Director of Grievance and Arbitration, will show that the Company never suggested that the Union would be prohibited from having direct access to the federal court for violations of the incorporated Side Letters of Agreement.  In any event, such an inquiry necessarily concerns disputed issues of fact that are not resolvable on the basis of the pleadings in the Union's complaint and, therefore, Defendant's motion for judgment on the pleadings must be denied.  Accordingly, the Union's complaint, alleging that the Company violated a provision of the 1985 Side Letter of Agreement by transferring employees from night stocking work to evening work and denying them the night shift premium, is properly before this Court.

**A.      Statement of Facts Set Forth In The Complaint.**

The Union's complaint alleges a violation of one of the provisions contained in the parties' 2004-2008 CBA.  Specifically, the 1985 Side Agreement, incorporated into the parties' CBA, provides:

ARTICLE 4 HOURS

* * *

> Section 5. Present night stocking crew will not be forced to evenings and lose the premium.

Under the 2004-2008 CBA full time and part time employees doing night stocking work are paid a premium of 75 cents per hour.  Complaint, ¶6.

On or about March 27, 2005 Shaw's forced approximately 75 bargaining unit employees doing night stocking work in stores covered by the 2004-2008 CBA to do stocking work in afternoon and evening hours that did not qualify for the 75 cents per hour premium. This has resulted in losses of earnings for full time employees of at least thirty dollars per week, and lesser amounts for part time employees.  Complaint, ¶7.

The Union's complaint claims that the Company's action in forcing the night stocking employees to do their work during afternoon and evening hours outside the hours for which the premium is paid violates the quoted provision of the 1985 side agreement contained in the 2004-2008 CBA.  Complaint, ¶8.

Finally, the Union's complaint alleges that "[t]he dispute between Local 791 and Shaw's is specifically excluded from arbitration under the parties' current 2004 – 2008 agreement." Complaint, ¶9.  Specifically, the CBA provides that "[t]he following 1985 and 1991 understandings are hereby continued but shall not be subject to arbitration."  Exhibit 1, CBA at 74.

Article 10 of the parties' CBA, "Insurance-Pension," contains numerous provisions for employee health insurance, disability benefits, and pension benefits.  Section 1 provides that the Company must pay monthly contributions to the Union's National Health & Welfare Fund.  The Company is also bound to the terms and provisions in a "Trust Agreement" for the Fund.  The CBA requires the Company to "continue medical insurance during leave, because of injury, illness or other related reasons."  (Section 14).  Another section of the article provides for a

3

dental insurance program.  Other sections of the article provides for full-time and part-time Short

Term and Long Term Disability coverage (Section 2), Life Insurance (Section 3), a pension plan

(Section 4) and a 401(k) plan (Section 5).  Section 6 requires the parties to establish a "Joint

Benefits Committee" and establishes procedures and obligations for the committee.  The final

section of Article 10, Section 7, then provides:

> **Section 7.**
>
> **Neither the provisions of this Article nor any question as to the application or interpretation of any of said programs may be made the subject of a grievance or be arbitrable under this Agreement** except disputes concerning determination of employer contribution rates to the Trust which shall be subject to expedited arbitration.  Hearings shall begin within sixty (60) days and be completed within ninety (90) days.

Exhibit 1, p. 22 (Emphasis supplied).

Article 13 of the parties' CBA contains a grievance and arbitration procedure.  Section 1

provides in pertinent part:

> **Section 1**.     The Company and the Union concur on the usefulness and mutual advantages of providing for the prompt and fair resolution of disagreements that could arise on the meaning and interpretation of this Agreement.  The following procedures are intended to be the sole means for the resolution of grievances, which for the purposes of this Agreement are defined as disputes between the Management and the Union or covered Employee(s) concerning the meaning or application of this Agreement.

Exhibit 1, CBA, p. 45.

The grievance process contains 4 steps, with Step 4 providing: "[i]f not settled at

Step 3, the matter may be appealed to arbitration in strict accordance with the procedures

for arbitration provided elsewhere in this Agreement."   Exhibit 1, CBA, p. 47.

**ARGUMENT**

**THE UNION HAS A RIGHT TO BRING A CLAIM FOR A VIOLATION OF THE 1985 SIDE AGREEMENT UNDER SECTION 301 OF THE LMRA**

A.     **UNDER THE PLAIN AND UNAMBIGUOUS TERMS OF THE CBA, THE UNION CAN BRING THE INSTANT ACTION AND IS ONLY PREVENTED FROM ARBITRATING AN ALLEGED VIOLATION OF THE 1985 SIDE AGREEMENT.**

The Company's motion must be dismissed because its claim, that the parties agreed to foreclose the Union's right to bring a breach of contract claim in federal court for an alleged violation of the 1985 Side Agreement, is nowhere to be found in the parties' CBA.  Instead, on its face, the parties' CBA only forecloses the Union from *arbitrating* a dispute over the 1985 Side Agreement.  Thus, on its plain terms, the CBA does nothing to prevent the Union from bringing the instant action.

The plain terms of the parties' CBA only excludes the parties from *arbitrating* an alleged violation of the 1985 Side Agreement.  Thus, paragraph 21 of Addendum One sets forth that "[t]he following 1985 and 1991 understandings are hereby continued but shall not be subject to arbitration."  Nothing more can be gleaned from this proviso that the parties cannot arbitrate a dispute concerning the 1985 Side Agreement.  Accordingly, under the plain and unambiguous terms of the CBA, the Union can bring the instant action for breach of the 1985 Side Agreement.

At the very least, it is the Company's burden to demonstrate that the parties' CBA clearly and unmistakably forecloses the Union from bringing the instant complaint and it cannot do so. Instead, the Company's alleged proof in this regard rests on a series of conjectures as to the parties' intent.  At the very least, these conjectures demonstrate a dispute of fact that cannot be resolved on the pleadings.

The Company claims that the Union is barred from bringing the instant complaint because it can file a grievance concerning a violation of the 1985 Side Agreement and is thereafter prohibited from submitting the grievance to arbitration.

It is well established that in the absence of an agreement for arbitration or some other form of final resolution of a dispute over an individual employee's rights arising under a collective bargaining agreement, a United States district court has subject matter jurisdiction over an action filed by the labor organization representing the employee for enforcement of the employee's rights as a third-party beneficiary of the collective bargaining agreement. 29 U.S. §185(a); *Smith v. Evening News Assn.*, 371 U.S. 195 (1962); *Local 369, Utility Workers Union of America, AFL-CIO v. Boston Edison Company*, 588 F. Supp. 800, 804 (D. Mass. 1984).

In *Local 369, supra*, the Union brought an action in federal court alleging, *inter alia*, that (1) the Union's grievance concerning the discontinuation of an employee's disability benefits was the proper subject of a grievance; and (2) if not properly the subject of a grievance, that the company had violated the parties' CBA by discontinuing an employee's disability benefits. The court held that in the absence of an agreement between the parties to arbitrate a dispute over an employee's rights arising under the collective bargaining agreement, the court had jurisdiction to determine whether an employee had been "terminated" under a Company's disability plan. The court observed:

> No doubt, also, it is legally permissible for parties to a collective bargaining agreement to commit some identified types of disputes to resolution out of court – by arbitration, for example – while reserving their right of direct access to court for other types of disputes.

588 F. Supp. at 804. Here, too, the parties have refused to provide for the arbitration of disputes over employees' rights under the 1985 Side Letter of Agreement. Accordingly, the court has

jurisdiction to determine whether the Company violated the agreement by removing employees from the night shift and refusing to continue paying them the night shift premium.

The case law cited by the Company to support its motion for judgment on the pleadings is readily distinguished from the controversy before this Court.  On the one hand, the Company cites to a number of cases where employees tried to bring claims relating to discipline where the collective bargaining agreements clearly prohibited such claims.  For example, in *Truex v. Garrett Freightlines, Inc.*, 784 F.2d 1347 (9th Cir. 1985), plaintiff employees tried to bring a breach of contract claim based on the company's issuance of written warnings.  However, the parties' collective bargaining agreement contained clear limitations on when warnings could be grieved, stating that warning notices were "automatically deemed protested by the employee, but grievances based on them will not be heard unless the notices are used as a basis for suspension or discharge within their effective life (nine months)."  784 F.2d at 1349.  There, it was obvious that the parties' intent was to limit the situations in which warnings could be grieved, i.e., only when they resulted in further discipline.  *Id.* at 1353.  Accordingly, the court dismissed the claim.

Similarly, the other cases relied upon by the Company are all federal actions brought by probationary employees contesting their terminations.  In each case, the parties had negotiated provisions into their collective bargaining agreements prohibiting probationary employees from contesting their discipline through the grievance/arbitration process.  As such, the collective bargaining agreements clearly provided greater redress rights to the non-probationary employees, who were permitted to grieve and arbitrate disciplinary actions.  See, *Hollins v. Kaiser Foundation Hospitals, Inc.*, 727 F.2d 823, 824 (9th Cir. 1984); *Young v. Anthony's Fish Grottos, Inc.,* 830 F.2d 993, 998 (9th Cir. 1987); *Young v. Southwestern Bell Telephone Co.,* 304 F. Supp. 475 (E.D. Ark. 1969); *American Postal Workers Union, AFL-CIO v. U.S. Postal Service,* 940

F.2d 704 (D.C. Cir. 1991).  In each case, the courts reasoned that the parties did not intend to give newer employees greater rights of redress than senior employees.  Rather, it was clear that the only purpose served by the distinction was to give the company unreviewable discretion to terminate probationary employees.

Here, in contrast, the parties' agreement to prohibit arbitration of the provisions in the 1985 and 1991 Side Agreements does not suggest that the parties intended to foreclose the right to bring a breach of contract action for violations of these provisions.  On the contrary, the distinctive nature of these provisions, rendered as Side Agreements outside of the main table collective bargaining, suggests that the parties simply treated these agreements differently from the rest of the agreement.  Further, while the Company ultimately came to agree to their incorporation into the Agreement, it was not willing to have the Side Agreements subject to the arbitration process.  However, nothing in this limitation suggests that either party was prevented from bringing a cause of action in federal court.[1]

**B.     THE UNION HAS PREVIOUSLY BROUGHT ACTION IN FEDERAL COURT FOR BREACH OF ANOTHER PROVISION IN THE CBA WHICH IS NOT SUBJECT TO ARBITRATION AND THE COMPANY NEVER CLAIMED THAT THE ACTION SHOULD BE DISMISSED FOR LACK OF JURISDICTION.**

The absurdity of the Company's claim of lack of jurisdiction is underscored by the fact that the Union has previously brought an action in federal court  based on the Company's alleged violation of the health insurance provisions contained in Article 10 of the CBA and the Company never moved to dismiss the Union's complaint for lack of jurisdiction.  See, *UFCW, Local 791 v. Shaw's Supermarkets, Inc.*, (D. R.I.), Civil Action No. 1:00-cv-00110-L.  Like the 1985 Side

---

[1]     The postal worker case. *Kroll v. U.S.*, 832 F. Supp. 199, 203 (E. D. Mich. 1993), is similarly inapposite to the facts in the instant matter.  There, the court found that the employee could not bring a claim for compensation under an employee suggestion program because the terms of the suggestion program clearly reserved ultimate decision making with management.   Here, of course, the 1985 Side Agreement does not contain any provisions conferring such unreviewable managerial authority.

Letter which is the subject of the instant complaint, the health insurance provisions in Article 10 are also not subject to arbitration.  Accordingly, the Union brought an action in federal court for a violation of the health insurance provisions and the Company did not raise any objection based on a lack of jurisdiction.  The Company's conduct in this earlier case demonstrates that the parties' agreement to not arbitrate certain provisions in the CBA does not preclude the parties from bringing an action in federal court.

Article 10 of the parties' CBA, "Insurance-Pension," contains numerous obligations by the Company to employee health insurance and pension benefits.  Section 1 provides that the Company must pay monthly contributions to the Union's National Health & Welfare Fund.  The Company is also bound to the terms and provisions in a "Trust Agreement" for the Fund.  The CBA requires the Company to "continue medical insurance during leave, because of injury, illness or other related reasons."  (Section 14).  Another section of the article provides for a dental insurance program.  Other sections of the article provides for full-time and part-time Short Term and Long Term Disability coverage (Section 2), Life Insurance (Section 3), a pension plan (Section 4) and a 401(k) plan (Section 5).  Section 6 requires the parties to establish a "Joint Benefits Committee" and establishes procedures and obligations for the committee.  The final section of Article 10, Section 7, then provides:

> **Section 7.**
>
> Neither the provisions of this Article nor any question as to the application or interpretation of any of said programs may be made the subject of a grievance or be arbitrable under this Agreement except disputes concerning determination of employer contribution rates to the Trust which shall be subject to expedited arbitration.  Hearings shall begin within sixty (60) days and be completed within ninety (90) days.
>
> Clearly, the language in this section preventing the parties from grieving or arbitrating the

health insurance plans, disability plans and pension plans were not intended to prevent a party

from bringing a federal court lawsuit for an alleged violation of these plans under ERISA.

Indeed, the Union has brought such a lawsuit for an alleged violation of the health insurance

provisions in Article 10.  In *UFCW, Local 791 v. Shaw's Supermarkets, Inc.*, Civil Action No.

1:00-cv-00110-L, the Union brought a breach of contract claim in the United States District

Court, District of Rhode Island, alleging that the Company's failure to offer a different health

insurance plan to employees after the closure of Harvard Pilgrim's Rhode Island coverage

constituted a violation of Section 1 of Article 10.  The Company never brought a motion

claiming that the Union's action should be dismissed based on the fact that Section 7 of Article

10 prohibited the Union from grieving or arbitrating such a violation.  See, Exhibit 2, Civil

Docket for case #: 1:00-cv-00110-L.  Instead, the Company opposed the Union's breach of

contract action solely on the merits, arguing that the retention of the Harvard Pilgrim plan

constituted a comparable health insurance plan under the CBA.  The Company's earlier stance

demonstrates that the parties' agreement to foreclose arbitration in certain areas was intended to

reserve the parties' right to direct access to court for these types of disputes.

**C.    AT A MINIMUM, THE COMPANY'S INTERPRETATION OF THE MEANING OF THE 1985 SIDE AGREEMENT IS A DISPUTE OF FACT THAT CANNOT BE RESOLVED ON THE PLEADINGS.**

As set forth above, the parties' collective bargaining agreement does not prohibit the

Union from bringing a breach of contract claim in federal court based on an alleged violation of

the parties' 1985 Side Agreement.  Because the collective bargaining agreement is, at the very

least, ambiguous, the fact finder would have to look to extrinsic evidence to determine if the

parties' mutual intent was to specifically exclude this forum.  Accordingly, the Company's

motion is, at a minimum, premature.

Indeed, the attached affidavit by Mary McClay, the Union's current Director of Grievance and Arbitration, demonstrates the critical importance of extrinsic evidence to deciding this issue. Exhibit 3. As set forth in the affidavit, Ms. McClay was the Union's office secretary during the parties' collective bargaining negotiations in 1991 – the negotiations which resulted in the incorporation of the 1985 Side Agreement into the parties' collective bargaining agreement. Exhibit 3, ¶¶3-4. As Ms. McClay attests, the Union first proposed including various side letters of agreement into the parties' CBA and the Company responded by proposing the language prohibiting the parties from arbitrating the 1981, 1985 and 1991 memoranda of agreements. Exhibit 3, ¶¶5-6. During these negotiations, the Company never suggested that the Union would be prevented from bringing an action for a violation of these agreements in federal court. The Company never attempted to distinguish the parties' rights to bring claims under Article 10 in federal court from the parties' rights with respect to the 1981, 1985 and 1991 Side Agreements. The Company never suggested that the Union was prohibited from anything other than arbitrating violations of these agreements. Accordingly, the Union believed that the Company's proposed language only meant that the parties' would be unable to arbitrate violations of the Side Letters but that they had reserved their right to direct access to federal court over such disputes. Exhibit 3, ¶¶8-9. Similarly, the Company had never suggested that the Union did not have a right to bring violations of the health and pension benefits under Article 10 in federal court, even though the parties had agreed that such violations could not be arbitrated. Exhibit 3, ¶10. Indeed, as set forth above, the Company has permitted such actions in court without ever contesting the court's jurisdiction over such matters.

In that the Company proposed the language prohibiting arbitration, it was incumbent upon the Company to suggest that this language prohibited breach of contract claims in federal

court. As Ms. McClay's affidavit attests, it did not. Accordingly, extrinsic evidence from the parties' negotiating history strongly suggests that the preamble to the 1981, 1985 and 1991 agreements was not intended to bar federal court action. At a bare minimum, the parties' intent with respect to direct access to the court for violations of the Side Letters is clearly a dispute of fact that cannot be resolved on the basis of the Plaintiff's complaint. Accordingly, Defendant's motion for judgment on the pleadings is, at best, premature.

## CONCLUSION

For all of the foregoing reasons, this Court should find that the parties have reserved their right to direct access to court for disputes, such as the instant complaint, that arise under the parties' 1985 Side Letter of Agreement. In the alternative, the Court should find that the parties' intent with respect to access to the court for such disputes is an issue of fact that cannot be resolved on the basis of the pleadings set forth in the Plaintiff's complaint. Accordingly, the Company's motion for judgment on the pleadings should be denied.

Respectfully submitted,

UNITED FOOD AND COMMERCIAL
WORKERS, LOCAL 791,
By its counsel,


s/Terence E. Coles_____
Terence E. Coles, Esquire
BBO# 600084
Pyle, Rome, Lichten, Ehrenberg
& Liss-Riordan, P.C.
18 Tremont Street, Suite 500
Boston, MA 02108
(617) 367-7200

Dated: February 21, 2006

## CERTIFICATE OF SERVICE

I hereby certify that the above document was filed electronically through the ECF system upon the court and counsel of record on February 21, 2006.


s/Terence E. Coles_____
Terence E. Coles

**AGREEMENT**
between
**UNITED FOOD AND**
**COMMERCIAL WORKERS UNION**
**LOCAL 791, AFL-CIO,CLC**
and
**SHAW'S SUPERMARKETS, INC.**
**SOUTHERN REGION STORES AND STORE MAINTENANCE**

**Effective Dates**
*August 1, 2004 – August 2, 2008*

This Agreement is made and entered into this 1st day of August 2004 between Shaw's Supermarkets, Inc. (for the Southern Region stores and store maintenance), a Massachusetts corporation with its principal place of business located at West Bridgewater, Massachusetts, hereinafter referred to as the "Employer", and United Food and Commercial Workers Local 791, AFL-CIO, a voluntary unincorporated association hereinafter referred to as the "Union".

# ARTICLE 1
# RECOGNITION

Subject to any applicable provisions of State or Federal law or regulation now or hereafter in effect, the Employer recognizes the Union as the exclusive bargaining agent with respect to wages, hours, and other conditions of employment of all Employees at the Employer's stores and warehouses presently, or hereafter, located in the following counties within the Commonwealth of Massachusetts: Norfolk, Plymouth, Bristol and Barnstable and the State of Rhode Island, including part-time Employees, but excluding executives, buyers, store managers, one perishable manager and one non-perishable manager per store, pharmacists and one personnel coordinator per store, office clerical Employees, guards, professional Employees and supervisors as defined by the National Labor Relations Act, and as hereinafter used in this Agreement the words "Employee" and "Employees" will be deemed to refer to and only to an Employee or Employees, respectively, of the Employer in the bargaining unit described above.

The Employer may employ two additional non-unit managers in new prototype stores. In high volume conventional stores the Employer may employ one additional non-unit manager provided that there is a full-time grocery manager assigned. In any conventional store with a food service operation, the Employer may employ two additional managers if there is a full-time grocery manager and one additional manager if no full-time grocery manager is assigned.

# ARTICLE 2
# UNION SECURITY

A. All Employees who are members of the Union as of the signing of this Agreement shall remain members of the Union as a condition of continued employment with the Employer.

B. All present Employees who are not now members of the Union shall make application for membership not later than the thirtieth (30th) day following the signing of this Agreement; and, if accepted, must remain members of the Union as a condition of continued employment with the Employer.

C. All Employees hired or transferred into the bargaining unit subsequent to the signing of this Agreement shall, not later than the thirtieth (30th) day after such hiring or transfer, make application for membership, and if accepted, must remain members of the Union as a condition of continued employment with the Employer.

D. The provisions of paragraphs A, B, and C of this Article shall not apply to any Employee covered by this Agreement whose membership in the Union is denied, or whose membership therein has been terminated for reasons other than the failure of such Employee to tender his/her initiation fee or periodic dues.

E.  It is understood that the Employer shall not be required to discharge any Employee under this Article for reasons other than the failure to pay periodic dues or initiation fees uniformly required as a condition of acquiring or maintaining membership in the Union.

F.  The Employer agrees to notify all new Employees under the bargaining unit about their obligations under this Article. New Employees shall be considered probationary for the first thirty (30) days of employment which probationary period may be extended an additional thirty (30) days by mutual Agreement of the Employer and the Union.  The store Manager must notify the Union office in writing, prior to the extension.

G.  In the event of a new store opening, there shall be a sixty (60) calendar day probationary period for newly hired Employees for that store, which probationary period may be extended an additional thirty (30) days by mutual Agreement of the Employer and the Union.  The Store Manager must notify the Union office in writing, prior to the extension.

## ARTICLE 3
## CHECKOFF

A.  The Employer, for each of its Employees who, individually and in writing, duly authorize the Employer to do so, will deduct from the earnings payable to each Employee, initiation fees and weekly Union dues for such Employee's membership in the Union and shall promptly remit to the Union all such deductions accompanied by a list of Employees from whom membership dues have been collected and this amount so deducted.  Said deductions shall be made from the wages paid on each weekly payday and shall be remitted to the President of the Union not later than the Friday of each week.

B.  The form of authorization shall be that set forth below and shall be revocable at the time and in the manner as therein described.  "You are hereby authorized and directed to deduct from my wages, the initiation fee and the weekly dues as established by members of the United Food and Commercial Workers Union, Local 791, AFL-CIO and certified to you by the President of that Union." "The sum(s) so deducted by you shall be remitted to the President of the Union.  This authorization shall remain in effect until:

(a)  Revoked by me and shall be irrevocable for a period of one (1) year from the date appearing hereon; or until the expiration of the present Agreement between the Employer and the Union (whichever is sooner) at which time it may be revoked by written notice by me to the Employer by registered mail at any time during the period of ten (10) days prior to the expiration of the one (1) year period or ten (10) days prior to the expiration of the present Agreement (whichever is sooner)";

(b)  When transferred permanently out of the bargaining unit.  If no such notice is given, this authorization shall be irrevocable for successive periods of one (1) year thereafter, or until the termination of the then current Agreement, whichever occurs sooner, with the same conditions and privileges or revocation at the end of each such period.

Signature
Date

C.   The Employer agrees to deduct periodically from the pay of each Employee who is a Union member and who executes an appropriate voluntary checkoff authorization form to the UFCW Active Ballot Club the amount specified in the checkoff authorization form signed and dated by the Employee.  The deduction shall continue for the life of this Agreement for each Employee who signs a checkoff authorization form unless the Employee revokes the authorization in writing. The Employer agrees to transmit periodically UFCW Active Ballot Club deductions to the UFCW Active Ballot Club in care of the local Union or the UFCW, as may be appropriate, together with the names of Employees for whom deductions have been made and the amounts deducted for each Employee.

All deductions and transmittals shall be subject to and in strict accordance with all applicable laws.

D.   The Employer agrees to deduct periodically from the pay of each Employee who is a Union member and who executes an appropriate voluntary checkoff authorization form to the UFCW Local 791 Special Defense Fund the amount specified in the checkoff authorization form signed and dated by the Employee.  The deduction shall continue for the life of this Agreement for each Employee who signs a checkoff authorization form unless the Employee revokes the authorization in writing.  The Employer agrees to transfer periodically UFCW Local 791 Special Defense Fund deductions to the UFCW Local 791 Special Defense Fund in care of the local Union or the UFCW, as may be appropriate, together with the names of Employees for whom deductions have been made and the amounts deducted for each Employee.

All deductions and transmittals shall be subject to and in strict accordance with all applicable laws.

E. An employee who falls in an arrears amount to the Union in excess of twenty-five dollars ($25.00) shall have that arrears amount deducted at no more than twenty-five dollars ($25.00) per week, in addition to their regular weekly deduction, until they are current.

F. The Company will provide new hires a check off authorization card as part of the hiring process.  The Union will provide check off cards in multiple copies; the Company will retain one signed copy and forward the other ones to the Union.

G.      The Union specifically agrees that the Employer shall be held harmless and without any further liability of any kind in exchange for the foregoing agreements to deduct and remit authorized monies.  The Employer's performance of the foregoing checkoff agreements constitutes its full and only obligations under this Article.

## ARTICLE 4
## HOURS

**Section 1.**  Hours of employment as heretofore observed by the Employer, shall, except as otherwise provided, continue in effect during the term of this contract.  The Employer agrees that no Employee shall receive a reduction in wages or increase in hours worked without being paid therefore as a

result of this contract.

**Section 2.  Full-Time Employees.**  The regular work schedule for full-time Employees shall be forty (40) hours, five (5) days, except as provided in Article 6, Section 4.

**Section 3.**

    **A. Part-Time Employees.**  For purposes of this Agreement, a part-time Employee is defined as one who is normally scheduled to work less than 35 hours weekly.  If a part-time Employee hired before 08/01/04 works more than 36 hours in a week, he/she shall be paid a premium of 30% for all hours worked in excess of 36 hours.

    B.  Part-timers hired before 08/01/04 shall be scheduled no less than fifteen (15) hours a week, Monday through Saturday, except during a holiday week.  However, all part-time Employees hired prior to July 27,1974, shall have the discretion to be scheduled no less than twelve (12) hours a week except during a holiday week.  Part-time employees hired after 08/01/04 shall be scheduled no less than fifteen (15) hours a week, Monday through Sunday, except during a holiday week. Part-timers shall be scheduled no less than twelve (12) hours a week during holiday weeks, except during weeks with Saturday holidays, when there shall be no minimum hours. Students may work less than fifteen (15) hours per week, provided the reduced hours are requested through a waiver form for a specified amount of time.  A copy of the waiver form will be forwarded to the Union office.  Part time employees who desire to be scheduled for less than the fifteen (15) hour minimum may be scheduled for less than this minimum, with management approval, provided the employee signs a written waiver, which will include a waiver of any health and welfare benefits for any waivers signed after the effective date of this agreement, only for employees hired after 8/1/04. An employee may revoke the waiver or reapply for a new waiver at any time. A copy of the agreed upon waiver form and/or request that the waiver be revoked will be forwarded to the Union office. In the event that more employees request minimum waivers than can be allowed, the requests will be honored by seniority. Non-student waiver schedules will include Friday and/or Saturday availability.  Managers will be sensitive to the needs of senior citizens and the hours they are allowed to work.

    C.  When additional part-time hours on a regular schedule are available, preference shall be given, in the order of seniority to the part-time Employee in the department (up to 32 hours a week), within the classification, within the store, provided said Employee is available on a continuing basis.  Part-time Employees interested in such additional hours shall submit a statement on a prepared form indicating hours and days available on a continuing basis.  The assignment of additional hours, if practicable, shall be made among said part-time Employees who submit such statements.  This in no way restricts the Employer from working Employees across classifications.

**Section 4.  Overtime.**     Overtime shall be worked and paid for when authorized by Store management or the designated person in charge.  No one shall be compelled to accept overtime in the stores, provided that employees may be required to accept overtime if there are insufficient volunteers available within the store with the necessary qualifications when the work is needed. Involuntary overtime will be assigned by rotation in inverse order of seniority among employees in the department who are at the store when the work is necessary.  If an employee volunteers for overtime, he/she will be placed on the bottom of the list for required overtime for that week. Overtime assignments will be made in compliance with State law.  Involuntary overtime shall not

exceed 2 hours per day or 8 hours per week per employee.  When there is involuntary overtime, it will be the employee's option to count the extra work as part of their regular workweek. Management will be sensitive to the personal needs of all employees in the assignment of involuntary overtime. Management will attempt to give no less than one hour prior notice of involuntary overtime.  No part-time employee hired prior to 7/27/01 may be compelled to accept overtime.

**Section 5.  Evening Work.**  No Employee who is full-time as of July 27, 1985 will be required to work more than two (2) evenings per week (after 6 PM), except, present (as of July 27,1985), full-time night stocking Employees, night cleaners and night bakery Employees.

**Section 6.  Overtime Pay**.  Hours worked by full-time and part-time Employees in excess of forty (40) shall be compensated for at the hourly rate of one and one-half (1½) times their regular rate for said excess hours, and in excess of thirty-two (32) hours in a holiday week.  If there are two (2) holidays during a week, overtime shall be paid after twenty-four (24) hours.

**Section 7.**

    **A.  Call-Ins and Report Pay.**  When full-time or part-time Employees are called in for other than their scheduled hours, they shall be paid a minimum of four (4) hours at the applicable rate. Reporting pay shall not be payable when the failure to provide work is beyond the control of the Employer.

    **B**.  **Call-In Hours.**  Part-time Employees who desire additional call-in hours shall submit a statement on a prepared form indicating the days and hours available for call-in hours on a continuing basis, and a telephone number where said Employee can be reached, from which group a list shall be established.  The assignment of call-in hours shall be made, as far as practicable, from said list in order of seniority.  Failure of a part-time Employee on said list to report in response to a call on two (2) consecutive occasions shall result in removal of that Employee's name from the list for a period of two (2) months unless otherwise mutually agreed.

    This procedure does not apply when the Company determines to assign hours on a hold-over basis.

    **C.  Additional Hours.**  When additional hours of unscheduled hold-over hours are available, they shall be distributed to the senior qualified part-time Employee in the department then on duty.

**Section 8.**

    **A.  Schedule.**  The schedules of all store Employees shall be posted by 1:00 p.m. of the day before the end of the previous week (for example, if the workweek begins on Sunday, it will be posted by Friday) in ink at the store time clock.  The schedule listing shall be made by department in order of seniority.  The schedule and any change therein shall remain posted for the entire week. Where changes are necessary, the Employer will make all reasonable effort to change the work schedules at least one day in advance; however, the Union recognizes that this will not be possible when factors are beyond the Employer's control, such as failure of the Employee to notify the Employer in reasonable time that he/she will not report for work.  Any schedule changes for stock-

taking will be made the Friday of the previous week.

    B.  Supper hours will begin no earlier than 3:30 P.M.

    C.  Employees assigned to early A.M. grocery stocking shall be scheduled no less than four (4) hours.

    D.  No Employee shall be required to work a scheduled split shift.  A split shift shall be defined as any shift where there is more than a sixty (60) minute break in the work schedule.

**Section 9.  Sharing of Overtime.**  The Employer will continue its practice as to sharing of overtime within the department, provided that scheduled overtime will be rotated within the department.

**Section 10.  Rest Periods.**  Full-time Employees may take fifteen (15) minutes for midmorning rest period and fifteen (15) minutes for mid-afternoon rest period. Such period to include time for lunch, if desired. Department head will be responsible for arrangement of rest periods to assure that there will be no disruption of customer service.  Part-time Employees shall receive a fifteen (15) minute break during their work shift.  Part-time Employee who works a seven (7) hour shift shall be given two (2) fifteen (15) minute breaks in addition to lunch period.  Relief periods shall be given as near as possible to the middle of the forenoon, afternoon, and evening work period.  When overtime work is assigned to full-time Employees after a regular work schedule, a twenty (20) minute break shall be scheduled immediately prior to the overtime and a fifteen (15) minute break each two (2) hours of overtime thereafter, except when said break coincides with the end of the work period; a third fifteen (15) minute break will be provided to all store Employees when working a scheduled eleven (11) hour day.  A fourth break will be provided to all store Employees when working a twelve (12) hour day.

**Section 11. Schedule Changes.**
    The Employer retains the right to alter the presently existing schedule of hours at its discretion where necessary, in its opinion, to the efficient operation of its business in the interest of providing a better service to its customers at lowest cost to it.  The Employer agrees, however, that it will not institute any changes in the work schedule affecting any change in the substantial proportion of the Employees (such as a change in shifts or company-wide or store-wide changes for a substantial period of time in regular hours of employment) without affording the Union reasonable opportunity to discuss such a change prior to announcing such change.

**Section 12.  Full-Time Overnight Grocery Stockers Schedules.**  Full-time overnight grocery stockers will not be scheduled to start earlier than 6:00 p.m. on Saturday unless they have been offered the opportunity to have Friday off.

## ARTICLE 5
## WAGES-WAGE PAYMENT

    A.  The rates of pay in effect during the term of this Agreement shall be those set forth in Appendix A hereto attached.  All store Employees shall be paid in cash, check or direct deposit.

    B.  Paychecks shall be ready no later than 9:00 A.M. Wednesday, except that if Wednesday

is a holiday, store checks shall be ready not later than 8:00 A.M. on Thursday.  The Employer agrees to arrange with an area bank to cash checks or checks can be cashed in the stores at no expense to the Employee.

C.  Vacation pay shall be paid in advance of the vacations and checks will be cashed in the stores, at no cost to the Employee.

D.  The Employer may hire, on a store by store basis, at any rate on the wage schedules or at rates above the schedules and such hiring rate will be the minimum hiring rate for that store as long as that store retains that rate.  When a store raises its hiring rate for inexperienced Employees in any job classification, incumbent Employees in that classification in that store who are below the new hiring rate will move immediately to the new hiring rate.

When a store reduces a hiring rate for new hires, no incumbent Employee will be affected.

Any part-time store Employee will be allowed to transfer to a store offering a higher starting rate.  The Employer will notify the Union in writing prior to implementing higher wage rates.  The Employer retains the right to place newly hired Employees at wage rates above the hiring rate based on prior relevant experience.

E.  Minimum Wage.  When the minimum wage is raised, the Company and the Union will meet to adjust the appropriate wage scales.

F. The Company will make payroll deductions available for a Union credit Union or another designated credit Union, in lieu of the current availability of direct deposit.

## ARTICLE 6
## HOLIDAY - SUNDAYS

**Section 1.**  The Employer agrees to recognize the following twelve (12) days as paid holidays under this Agreement, as hereinafter provided.

### Major Holidays

| | |
|---|---|
| New Years Day | Independence Day |
| Memorial Day | Labor Day |
| Christmas Day | Thanksgiving Day |
| Three Personal Holidays* | |

*Personal holidays shall be granted on two (2) weeks prior notice, except that the Employer may, on a seniority basis, limit the number of Employees taking a particular day if the demands of the business so require.  Personal days may be used for an Employee's birthday on two weeks prior notice.  If an Employee does not use his/her personal days they will be forfeited unless the Employee is unreasonably denied a requested day. When a state of emergency is declared, Employees may apply personal days to make up for lost hours.

### Part-Time

Employees hired on or after July 31, 1994 will earn personal days during their first year of employment, based on their period of employment, on the following non-cumulative schedule:

one day after 3 months<br>
one day after 6 months<br>
one day after 9 months<br>
three days effective January 1 (after 6 months of service)

Personal holidays will be rescheduled if the Employee is out sick or on funeral leave.

**Minor Holidays**

Patriots Day<br>
Columbus Day<br>
Veterans Day

**Rhode Island Stores.**  In Rhode Island stores, the holidays are the same, except that V-J Day is substituted for Patriots Day and is recognized as a major holiday.

**Section 2.    Holiday Pay Eligibility - Full-Time Employees.**  In order to be eligible for holiday pay, an Employee must be a full-time Employee and must have worked his/her last scheduled work day before, and the first scheduled work day after, the holiday, and the day of the holiday, if scheduled, except for absence due to death in a family in accordance with Article 9 of this Agreement, or in case of proven illness in which case he/she must have worked at least one day during the holiday week.  If a full-time Employee is injured on the job in a holiday week and is absent his/her scheduled work day before, or after, the holiday, or both, because of said injury, he/she shall not suffer the loss of holiday pay for that week only in which the said injury occurs.

**Section 3.**

**A.  Holiday Pay Eligibility - Part-Time Employees.**  Part-time Employees who have averaged fifteen (15) hours per week during the eight (8) weeks prior to the two (2) weeks immediately preceding the week in which the holiday falls (including paid vacation, holiday hours, and paid sick leave) shall be paid for the holiday according to the average number of hours worked during the aforesaid eight (8) week period as set forth below; provided that they have been employed by the Employer for six (6) months, and worked the last scheduled day before and the first scheduled day after the holiday, and the day of the holiday, if scheduled, except for absence due to death in the family in accordance with Article 9 of this Agreement, or in case of proven illness, in which case they must have worked at least one day during the holiday week.

B.  If a part-time Employee is injured on the job in a holiday week and is absent on his/her scheduled work day before, or after, the holiday, or both, because of said injury, he/she shall not suffer the loss of holiday pay for that week only in which the said injury occurs.

C.  A part-time Employee who is absent for part of the eight (8) week period due to a work related injury shall be paid holiday pay of at least four (4) hours (at least six (6) hours if employed for five (5) years or more) if he/she meets the above requirements for work during the holiday week.

D.  A part-time Employee who returns from a work related injury on the day after a holiday which is his/her first regularly scheduled work day in that week (excluding days absent because of

proven illness or absence due to funeral leave in accordance with Article 9) is eligible for holiday pay of at least four (4) hours (six (6) hours if employed for five (5) years or more) if he/she meets any requirements which apply for full-time Employees concerning medical documentation of the accident.

Less than 24 hours- 4 hours pay<br>
24 to 30 hours - 6 hours pay<br>
30 to 35 hours - 7 hours pay<br>
35 hours and over - 8 hours pay

E.  Part-time Employees with five (5) or more years of service shall be paid a minimum of six (6) hours of holiday pay if they meet the above requirements for work during the holiday week.

F.  Part-time Employees shall not be disqualified from holiday pay by virtue of job-related injury when otherwise eligible.

**Section 4.**

**A.  Work Performed on a Holiday or Sunday.**  If any work is performed on any of the minor holidays, all Employees who work on such days will be compensated at the rate of one and one-half (1½) times their regular rate of pay for hours worked in addition to receiving their regular weekly pay for the week but such hours worked shall not be counted as hours worked toward figuring weekly overtime.  All Employees hired before July 31, 1994 who work on major holidays will be paid the rate of two (2) times their regular rate of pay for hours worked in addition to receiving their regular weekly pay for the week but such hours worked shall not be counted as hours worked toward figuring weekly overtime.  The foregoing shall also apply to store Employees hired on or after July 31, 1994, except that the work on the holiday will be compensated at time and one-half their regular rate of pay.  For purposes of this Article, during holiday weeks the scheduled work week for all full-time Employees shall consist of thirty-two (32) hours, unless two holidays fall during the week, in which case the scheduled work week shall be twenty-four (24) hours.

B.  If the Employer elects to open its store or a department within the store on Sunday, the Employees will receive one and one-half (1½) times their regular rate of pay for all hours worked, such hours to be voluntary.  Prior to implementing such a schedule, the Employer will notify the Union and discuss same.   Store maintenance Employees will be paid double time for work on Sundays.

**Section 5.**

If the Employer wishes to call in full-time store Employees for added work on regular work days during a holiday week, all Store Employees shall have the option of working the difference between the thirty-two (32) and forty (40) hours.  Hours in excess of thirty-two (32) in a holiday week shall be paid at the rate of time and one-half  (1½).

**Section 6.**

When a store is open on a Sunday, or holiday, Employees who work shall be paid a minimum of four (4) hours at the applicable rate.  Sunday work shall be assigned first to employees who

volunteer to work Sunday as part of their regular scheduled workweek.

**Section 7.**

When an Employee is requested by the Employer to work any Sunday or holiday, the Employee shall receive the Sunday and holiday rates described above for hours worked, but such hours worked shall not be counted as hours worked toward figuring weekly overtime.

**Section 8.  Deleted**

**Section 9.**

Employees shall work up to forty-five minutes, as needed, beyond closing hours in the event of early store closing on New Year's Eve and Christmas Eve.

**Section 10.**

Employees who are 55 or older with ten (10) years of service will be reimbursed at full pay for any unused personal days remaining for the year in which they retire.

**Section 11.**

Work on Sundays and holidays shall be voluntary. Employees may be compelled to accept holiday work if there are insufficient volunteers with the necessary qualifications.  Mandatory holiday work will be assigned in inverse order of seniority.  Sunday and holiday work may be allocated separately to full time employees and part time employees to obtain the full-time/part-time ratio determined appropriate by store management, and shall not exceed 8 hours for full-time employees.  Sunday and holiday assignments will be made in compliance with State law.

If there are more employees with Sunday and Holiday availability than needed by the Employer, Sunday and Holiday work shall be rotated among employees with the necessary qualifications by seniority within their classification.

### ARTICLE 7
### VACATIONS

**Section 1.**  Employees shall be eligible for vacations on the following schedule:

| | |
|---|---|
| 1 Year | 1 Week |
| 2 Years or more | 2 Weeks |
| 5 Years or more | 3 Weeks |
| 12 Years or more | 4 Weeks |
| 20 Years or more | 5 Weeks |

Eligibility shall be on the anniversary date of employment.

Vacation credit will be posted in January. Vacation time will be available for schedule and

use, but vested over 10 months. Terminated Employees, except those who are 55 or older with 10 years of service, will be paid only for vested time. Any vacation time paid in excess of the vested amount will be repaid. The Employee's final pay will be subject to withholding as full or partial repayment.

**Section 2.  Part-Time Employee Eligibility.**  A part-time Employee with less than five (5) years service as of the anniversary date of employment must have accumulated at least 250 hours (including vacation, holidays, and sick pay) during the year prior to his/her anniversary to be eligible. Part-time employees hired after the effective date of this agreement must have accumulated 780 hours (including vacation, holidays and sick pay) during the year prior to his/her anniversary to be eligible.

**Section 3.  Scheduling of Vacations.**  Vacations taken during the regular vacation season will be assigned on the basis of the Employee's company seniority with limitations being placed upon such classifications as are necessary, in the opinion of the Employer, to properly effectuate the demands of the business. When a holiday falls during a vacation week, the Employee is to receive an extra day of vacation, either the last scheduled work day prior to that vacation or the first scheduled work day of the week that the Employee returns to work at the Employee's option and that week shall be treated as a holiday week for all purposes. The Employer will make its best efforts to schedule each full-time Employee for two weeks of his/her vacation during the public school vacation, before any other vacations are scheduled.

Schedules for vacation shall be posted on April 15. Employees shall have an opportunity for the succeeding two (2) weeks to indicate their vacation preference in order of seniority in their classification.

Vacations must be taken in the calendar year in which they accrue and may not be accumulated, except with the consent of the Employer.

**Section 4.  Amount of Vacation Pay.**  Pay for vacation hours will be based on the regular weekly rate and schedule. Overtime shall not be counted in determining vacation pay. Vacation pay for part-time Employees will be based on the average hours worked during the 52 weeks preceding their most recent anniversary. Weeks during which an Employee was absent due to temporary illness or injury will be excluded from the calculation.

If feasible, all part-time insurance deductions are to be taken out of the paycheck prior to the vacation.

**Section 5.**  An Employee shall not be required to take his/her military training duty as his/her earned vacation.

**Section 6.**  Accrued vacation pay shall be paid on termination, except a discharge due to dishonesty.

**Section 7.**

Any employee with four (4) or more weeks vacation may take one week in vacation days. Full time employees with five years or more of service may take up to two weeks of their vacation allotment

in vacation days.  Full week vacations and personal days will take precedence over requests for vacation days.

**ARTICLE 8**
**SICK LEAVE**

**Section 1.**

A.  All full-time Employees who were appointed before July 27, 1997 and have at least one year of service as of January 1, and who are actively employed will be credited with nine (9) days of sick leave effective each January 1, or on such later date when they resume active employment.  Any sick leave which remains unused as of December 31 will be reimbursed at full pay during the month of January provided the Employee is still employed as of December 31.

All full-time Employees who were appointed after July 27, 1997, who have at least one year, but not more than two years, of service as of January 1, and who are actively employed will be credited with five (5) days of sick leave effective January 1, or on such later date when they resume active employment.  All full-time Employees who were appointed after July 27, 1997, who have at least two years, but not more than three years, of service as of January 1, and who are actively employed will be credited with seven (7) days of sick leave effective January 1, or on such later date when they resume active employment.  All full-time Employees who were appointed after July 27, 1997, who have at least three years, but not more than four years, of service as of January 1, and who are actively employed will be credited with eight (8) days of sick leave effective January 1, or on such later date when they resume active employment.  All full-time Employees who were appointed after July 27, 1997, who have at least four years of service as of January 1, and who are actively employed will be credited with nine (9) days of sick leave effective January 1, or on such later date when they resume active employment. Any sick leave which remains unused as of December 31 will be reimbursed at full pay during the month of January provided the Employee is still employed as of December 31.

B.  Full-time Employees appointed before July 27, 1997 who attain their first anniversary date after January 1 will be credited with one (1) day of sick leave for each full 45 calendar days remaining in the calendar year.  Any days remaining unused at the end of the year will be reimbursed under the conditions set forth above.  Employees promoted to full-time during the year and on a date prior to July 27, 1997 will be credited with one additional day of sick leave for each full 45 days remaining in the calendar year up to a maximum entitlement (inclusive of part-time sick leave) of nine days in the year.

Full-time Employees appointed after July 27, 1997 who attain their first anniversary date after January 1 will be credited with one (1) day of sick leave for each full 70 calendar days remaining in the calendar year.  Any days remaining unused at the end of the year will be reimbursed under the conditions set forth above.  Employees promoted to full-time during the year and on a date after July 27, 1997 will be credited with one additional day of sick leave for each full 70 days remaining in the calendar year up to a maximum entitlement (inclusive of part-time sick leave) of five days in the year.

C.  All part time Employees hired prior to July 27, 1997 who have at least two years of

service as of January 1 and who are actively employed as of January 1 will be credited with 24 hours of sick leave each January 1, or on such later date when they resume active employment. Any sick leave which remains unused as of December 31 will be reimbursed at full pay during the month of January, provided the Employee is still employed as of December 31. Part-time Employees hired prior to July 27, 1997 who attain their second anniversary date after January 1 will be credited with two hours of sick pay for each full month remaining in the calendar year. Any hours remaining unused at the end of the year will be reimbursed under the conditions set forth above.

All part-time Employees hired after July 27, 1997 who have at least two years, but not more than three (3) years, of service as of January 1, and who are actively employed as of January 1 will be credited with twelve (12) hours of sick leave each January 1, or on such later date when they resume active employment. All part-time Employees hired after July 27, 1997 who have at least three (3) years, but not more than four (4) years, of service as of January 1 and who are actively employed as of January 1 will be credited with eighteen (18) hours of sick leave each January 1, or on such later date when they resume active employment.

All part-time Employees hired after July 27, 1997 who have at least four (4) years, as of January 1 and who are actively employed as of January 1 will be credited with twenty- four (24) hours of sick leave each January 1, or on such later date when they resume active employment. Any sick leave which remains unused as of December 31 will be reimbursed at full pay during the month of January, provided the employee is still employed as of December 31.

Part-time Employees hired after July 27, 1997 who attain their second anniversary date after January 1 will be credited with one hour of sick pay for each full month remaining in the calendar year. Any hours remaining unused at the end of the year will be reimbursed under the conditions set forth above.

D. Any Employee who has sick days or hours accumulated under the carryover provisions as of December 31, 1988 will be allowed to maintain that existing balance. One-half of any days remaining in a full-time Employee's current year sick leave allowance as of December 31, 1988 will be credited to the sick leave carryover up to a maximum carryover of 40 days. One-half of any hours remaining on a part-time Employee's current year sick leave allowance as of December 31, 1988 will be credited to the sick leave carryover up to a maximum carryover of 100 hours. Any Employee who is age 55 or older with 10 years of service will receive sick pay, including banked sick time, upon leaving the Company, and said payment shall be a lump sum. Sick leave shall be charged against current sick leave allowance until exhausted.

E. The anniversary date of Employees will be the Monday of the week in which the anniversary of their employment occurs. In the event an eligible Employee receives Worker's Compensation, the Employer agrees to pay only the difference to total a regular weekly wage.

F. Verifications of accidents or illness may be required by the Employer if the Employee is patterning, or if the Employer has reasonable suspicion of abuse. Sick leave will not be construed as time worked in the computation of overtime compensation.

## ARTICLE 9
## FUNERAL LEAVE

A.  In the event of a death in the immediate family of a full-time Employee, the full-time Employee shall be granted three (3) working day's leave without loss of pay which shall include the day of burial.  A leave of five (5) work days without loss of pay, which will include the day of burial shall be granted in case of death of the spouse, child or stepchild of the Employee.

B.  For the purpose of this Article, it is agreed that a member of the immediate family shall be considered to be the Employee's Father, Mother, Brother, Sister, Mother-in-law, Father-in-law, Grandchild, a Grandparent who provided parental care to the Employee, or who was residing in the Employee's home at the time of death, or any member of the family residing in the Employee's home.

C.  The date of notification of death of a member of the immediate family to those Employees who are on the job shall not be counted as one of the three (3) days funeral leave.

D.  The Employer agrees that in the event of the death of a Grandparent, Son-in-law, Daughter-in-law, Brother-in-law, or Sister-in-law, of any full-time Employee, the Employee shall be granted one (1) work day off without loss of pay to attend the funeral.  Part-time Employees shall be granted the same funeral leave benefits without loss of pay only according to hours they are regularly scheduled to work during this period.

E.  An Employee on funeral leave will be allowed to use sick leave, personal days, or vacation days as an extension of funeral leave.

## ARTICLE 10
## INSURANCE-PENSION

**Section 1.**

**A.  UFCW Health & Welfare Trust**

1.  The Employer will pay monthly contributions to the United Food & Commercial Workers National Health & Welfare Fund (the "Fund") for projected costs for claims, administrative expenses and required reserves.  The monthly contribution will be adjusted as required below to account for projected medical trend and any actuarial factor or credit required by the National Fund's underwriting policy.  The Fund will issue adjusted monthly contribution at least 30 days before it being effective.  Effective March 1, 2002 the monthly contributions will be converted to a three tier structure.  Tier I will be individual, Tier II will be two person or single parent family, and Tier III will be family.

Employer Contribution:

| Effective Date | Individual | 2 Person or Single Parent Family | Family |
|---|---|---|---|
| Sept.1, 2004 | $294.42 | $666.02 | $963.27 |
| March 1, 2005 | $290.58 | $658.08 | $955.45 |

If a change of Employer Contribution is necessary such change shall be made as follows:

| | |
|---|---|
| June 1, 2006 | Maximum Increase of 10% or maximum decrease of 5%, |
| June 1, 2007 | Maximum Increase of 9% or maximum decrease of 5%, |
| June 1, 2008 | Maximum Increase of 9% or maximum decrease of 5%. |

2.      The Employer has signed a Participation Agreement and agrees to be bound by all of the terms and provisions of the Agreement and Declaration of Trust of the National Health and Welfare Fund (the "Trust Agreement"), as currently in force and with such subsequent amendments which are adopted by the Trustees of the "Fund".

3.      The Employer shall make contributions to the "Fund" monthly by the 10th of that month. For terminated employees, the last Employer payment will be made the 10th of the month for the month termination takes place, with coverage effective for that entire month.

        The Employer's obligation to contribute to the "Fund" shall remain in effect until either the expiration of the collective bargaining agreement, or the Employer is no longer under a duty to make such contributions according to the National Labor Relations Act or other applicable law, whichever is later.

4.      Nothing herein contained shall limit the right of the Employer and the Local Union, by mutual agreement, to terminate participation in the "Fund", subject to the terms of the then existing "Trust Agreement".

## B.      Medical Benefits

1.      Employees will be eligible for medical insurance provided by the "Fund" as described by the Summary Plan Description and Plan Document as amended from time to time.

2.      Employees will be eligible for and may enroll or change enrollment in the medical insurance program during new hire eligibility, or within 30 days of a qualified family or employment status change, or during the annual enrollment period established by the Company.  Initial coverage will be effective under the same terms and conditions as non-bargaining unit employees, but no later than the first of the month after 3 months of employment.  Changes made within 30 days of a qualified event will be effective the first of the month after the event or notification if later.  Changes made during the annual enrollment period will be effective the first of the new plan year.  The Employer fully retains the right to change terms and conditions of enrollment.

3.      Full-time employees enrolled in medical insurance coverage will be required, as a condition of continued coverage, to pay the Employer weekly by payroll deduction or otherwise as follows:

| Effective Date | Individual | 2 Person or Single Parent Family (3/1/02) | Family |
|---|---|---|---|
| August 1, 2003 | $5.00 | $6.00 | $9.00 |
| Sept 1, 2004 | $7.00 | $10.00 | $12.00 |
| March 1, 2005 | $8.00 | $13.00 | $16.00 |
| June 1, 2006 | $10.00 | $16.00 | $18.00 |
| June 1, 2007 | $10.00 | $16.00 | $20.00 |
| June 1, 2008 | $11.00 | $17.50 | $22.00 |

4.      Full-time–employees may take advantage of the Employer's opt out plan for medical insurance coverage.  Employees electing to exercise this option will receive additional payroll compensation in lieu of medical insurance coverage and contribution on the same terms and conditions as non-bargaining unit employees.  The Employer fully retains the right to change terms and conditions except that family opt-out will not be less than $100 per month.

5.      Part-time employees with less than three (3) years of service are only eligible to enroll with individual coverage.

6.      No part-time employee, otherwise eligible, who is presently or subsequently covered under any other group medical insurance plan shall be afforded coverage by the "Fund".  Said coverage shall be subject to any non-duplication and/or coordination of benefits provisions in the "Fund".

7.      Part-time employees enrolled in individual medical coverage with less than three (3) years of service will be required as a condition of continued coverage, to pay the Employer the full "individual premium" by payroll deduction or otherwise.

8.      Part-time employees enrolled in individual medical insurance coverage with three (3) or more years of service will be required, as a condition of continued coverage, to pay the Employer the same deductions per week by payroll deduction or otherwise as full-time employees.

9.      Part-time employees enrolled in family medical coverage with three (3) or more years of service will be required as a condition of continued coverage, to pay the Employer by payroll deduction or otherwise the full "family premium" less the company cost of individual coverage. The Employer shall contribute 35% of the additional cost for part-time employees with five (5) or more years of service who are enrolled with family medical coverage.

10.     Deleted

11.     Early retirees hired before July 31, 1994 and early retirees hired on or after July 31, 1994 who retire with twenty (20) years of service may purchase, at their own expense, coverage from the "Fund".

12.     The Employer shall maintain the medical insurance program as a program qualified under Section 125 of the Internal Revenue Code.

13.     COBRA coverage and HIPPA certification shall be provided by the "Fund".

14.     The Employer will continue medical insurance during leave, because of injury, illness or other related reasons, by making the appropriate payments to the Fund.  If an employee on leave falls into arrears in their employee contributions for medical coverage, the Employer and the employee will arrange a payment plan acceptable to the Employer to pay back the unpaid contributions.  If the employee is not current with a payment plan, and in arrears more than the "individual premium" or 12 weeks, whichever comes first, then the Employer may notify the Fund to cancel coverage.

**C.  Dental**

1.      Employees may enroll or may change enrollment in the dental insurance program during new hire eligibility period, or within 30 days of a qualified family or employment status change, or during the annual enrollment period established by the Company.  Initial coverage will be effective under the same terms and conditions as non-bargaining unit employees but not later than the first of the month after 3 months of employment.  Changes made within 30 days of a qualified event will be effective the first of the month after the event or notification if later.  Changes made during the annual enrollment period will be effective the first of the new plan year.  The Employer fully retains the right to change the terms and conditions of enrollment.

2.      The dental plan will provide 100% payment for covered procedures when performed by a participating dentist.  Maximum annual benefit will be $1,500.

3.      Part-time employees with less than three (3) years of service are only eligible to enroll with individual coverage and will be required as a condition of continued coverage, to pay the Employer the full "individual premium" by payroll deduction or otherwise.

4.      Part-time employees with three (3) or more years of service may enroll in family dental coverage and will be required as a condition of continued coverage, to pay the Employer by payroll deduction or otherwise the full "family premium" less the company cost of individual coverage. Effective March 1, 2002, the Employer shall contribute 35% of the additional cost for part-time employees with five (5) or more years of service who are enrolled with family dental coverage.

**D.**      Full and part-time Employees who were enrolled in HMO's as of July 26, 1991 will be entitled to remain covered under the plan in which they are enrolled as long as that plan is willing to provide group Insurance to Shaw's Employees.  The Employer will pay the cost of such HMO coverage for full-time Employees with a contribution not to exceed the Employer's prevailing insured medical cost.  For part-time Employees with more than two years of service the Employer will pay the cost of HMO individual coverage with a contribution not to exceed the Employer's prevailing insured medical premium for individual coverage.  In the case of part-time Employees with five or more years service who maintain continuing family coverage under an existing HMO, the Employer's contribution will not exceed 35% of the additional cost of family coverage under the Employer's prevailing insured medical and dental plans.

**E.**      The parties agree that it is essential to the long term health of the Company and the job security of the Employees to take action to control the rate of increase in health insurance premium costs.

**Section 2.  Disability**

A. Full-time

1.      The Employer will provide full-time Employees with one (1) year of service Short Term Disability (STD) coverage (by insurance or otherwise) in an amount equal to two-thirds of a normal hour's pay with a maximum of $10.00 per hour for 26 weeks, effective after the Employee has exhausted Company sick leave, subject to the terms of the applicable insurance policy.  STD benefit

payment for a full week will be based on a 40 hour week. This coverage shall not apply in the case of injury covered by Worker's Compensation Act.

Full-time Employees may elect at employment, within 30 days of a qualified family or employment status change, or during the annual enrollment period to purchase Optional STD until covered under company paid plan, subject to the terms of the applicable insurance policy.

2.      Full-time Employees may elect at employment, within 30 days of a qualified family or employment status change, or during the annual enrollment period to purchase Supplemental STD to increase the maximum hourly benefit to 2/3's of hourly rate with a maximum of $25.00 per hour, subject to the terms of the applicable insurance policy.

3.      Full-time Employees may elect at employment, within 30 days of a qualified family or employment status change, or during the annual enrollment period to purchase Long Term Disability coverage, at the rates through a separate plan of the Employer, to replace 60% of the Employee's annual base salary if the Employee is disabled for more than twenty-six (26) calendar weeks, subject to the terms of the applicable insurance policy.

Optional STD, LTD, and  Supplemental STD coverage will be effective under the same terms and conditions as non-bargaining unit employees but initial coverage will be no later than the first of the month after 3 months of employment. The Employer fully retains the right to change the terms and conditions of enrollment.

Changes made within 30 days of a qualified event will be effective the later of the first of the month after the event or notification if later, or the first of the month after approval from the insurance company for coverage requiring evidence of insurability.

Changes made during the annual enrollment period will be effective the later of the first of the new plan year or the first of the month after approval from the insurance company for coverage requiring evidence of insurability.

B. Part-time

The Employer will provide part-time Employees with two (2) years of service STD coverage (by insurance or otherwise) in an amount equal to two-thirds of a normal hour's pay with a maximum of $10.00 per hour and with a minimum of $105 per week for twelve (12) weeks, effective the 8th day of absence due to illness or injury, subject to the terms of the applicable insurance policy. STD benefit payment for a full week will be based on weekly average hours worked. This coverage shall not apply in case of injury covered by the Worker's Compensation Act.

## Section 3.  Life Insurance.

A.      The Employer will provide full-time Employees with one year of service, life insurance in the amount of one (1) times their annual base salary.  The Employer will provide part-time Employees with two years of service, life insurance in the amount of $10,000.00, subject to the terms of the applicable insurance policy.

B.      Employees may elect at employment, within 30 days of a qualified family or employment status change, or during the annual enrollment period Optional life insurance on the same terms and conditions as offered to non-bargaining unit employees.  The Employer fully retains the right to change the plan design, vendors, and terms.  The maximum coverage available will be equal to greater than five (5) times their annual base pay, subject to the terms of the applicable insurance policy.

C.      Employees may elect at employment, within 30 days of a qualified family or employment status change, or during the annual enrollment period to purchase life insurance for their spouse and eligible dependent children subject to the terms of the applicable insurance policy and on the same terms and conditions as offered to non-bargaining unit employees.  Initial enrollment will be no later than the 1st of the month after 3 months of employment.  The maximum spousal coverage available will be equal to or greater than $25,000.  The maximum child(ren) coverage available will be equal to or greater than $10,000.  The Employer fully retains the right to change plan design, vendors, and terms.

D.      Initial coverage will be effective the first of the month after approval from the insurance company for coverage requiring evidence of insurability.

E.      Changes made within 30 days of a qualified event will be effective the later of the first of the month after the event or notification if later, or the first of the month after approval from the insurance company for coverage requiring evidence of insurability.

F.      Changes made during the annual enrollment period will be effective the later of the first of the new plan year or the first of the month after approval from the insurance company for coverage requiring evidence of insurability.

## Section 4.  Pension

A.      Employer sponsored Pension Plan for eligible Employees will provide service benefits for each year of credited service, subsequent to January 1, 1975.  Effective November 6, 1988 Employees will be eligible for up to a maximum of 40 years of credited service under the plan.  The basic benefit multiplier for credited service will be:

> $39 for service before January 1, 2006,
> $40 for service on or after January 1, 2006,
> $41 for service on or after January 1, 2008.

Supplemental pension credit will be applicable to work performed in warehouse and store maintenance positions:  The multiplier for credited service in such positions will be

> $44 for service before January 1, 2006,
> $45 for service on or after January 1, 2006,
> $46 for service on or after January 2008.

B.      Eligible part-time Employees shall be entitled to pension benefits on a fractional basis for each year of credited service subsequent to January 1, 1976.

C.     Any future non-technical amendments to the Union pension plan shall be subject to approval by the Union.

### Section 5.  401(k)

The company will offer the same 401(k) plan offered to non-bargaining associates with the exception of company contribution for match and profit sharing.  The company fully retains the right to modify the plan including: design, investments, and vendors.

### Section 6.  Joint Labor Management Committee for Employee Benefits.

The Union and the Company will establish a Joint Benefits Committee.  Each party will designate up to five representatives to serve on the committee.  The committee will meet at least quarterly.

The committee will jointly determine agendas for each meeting. Minutes of each meeting will be kept and shared with the Union and the Company. The committee will prepare an annual report describing its findings and achievement. Members of the committee who disagree with the contents of the report may file a response which will be included as part of the report. This report will be distributed to the Union and the Company at the end of the month following each year of the contract. The Company agrees to provide access to all Union-related Employee benefit information, regarding Employees within the collective bargaining unit. The committee is responsible for keeping this information confidential.

The committee will play an active role with bargaining unit Employees in the implementation of any new Employee benefit programs.  The committee will review and assess all education programs related to bargaining unit Employee benefit programs.  The committee will assess the quality and costs of all Employee benefit programs. They will give reasonable consideration to all potential strategies to control costs, including, without limitation, increasing efficiency in administration, benefit adjustments and plan design modifications and will recommend changes or modifications of these programs where appropriate.

One purpose of the committee is to educate the members about the rising cost of health care and quality issues that effect employees, their families, and the competitive position of the company.

A special study group will be established within the committee to evaluate the funding strategy and the investment strategy and financial performance of the Union pension plan.

The committee will evaluate optional supplemental benefit programs that can be provided through Local 791 and will make a recommendation to the bargaining parties by December 1, 2001 whether or not to transfer this benefit responsibility to Local 791.

### Section 7.

Neither the provisions of this Article nor any question as to the application or interpretation of any of said programs may be made the subject of a grievance or be arbitrable under this

Agreement except disputes concerning determination of employer contribution rates to the Trust which shall be subject to expedited arbitration. Hearings shall begin within sixty (60) days and be completed within ninety (90) days.

## ARTICLE 11
## UNIFORMS

A.  Whenever the Employer requires the Employees to wear uniforms, coats, aprons, or frocks, the uniforms shall be furnished and laundered by the Employer. Full-time Employees shall be furnished such laundered uniforms with not more than two (2) changes weekly, except that Employees in the meat rooms shall be provided daily changes and shall also be provided thermal vests, if requested, provided the Employees so requesting shall wear the vest. Meat Cutters shall be provided with protective aprons, and Employees assigned to Meat Room cleaning duties shall have coveralls available to them. Part-time Employees will be provided uniform changes as necessary. Each Employee shall turn in the soiled garment in order to receive a fresh one and should use every precaution to keep said garment clean.

B.  Thermal vests shall be provided to the primary person responsible for Dairy and Frozen Food.

C.  Three protective aprons shall be made available to warehouse maintenance Employees when handling corrosive substances and shall be made available to porters as needed.

D.  The Employer will have anti-corrosive footwear available for the use of store and warehouse maintenance Employees when working with acid.

E.  Grocery Stockers shall wear and be furnished with two Company polo shirts, which may be exchanged for replacements as needed.

## ARTICLE 12
## SENIORITY

A.      When ability, availability and skills are equal, the principle of seniority is to govern in cases of lay-off and recalls within each job classification as a separate seniority unit. Meat cutters who would otherwise be laid-off and who have previously served as second men may bump less senior second men in order to avoid being laid-off. For all purposes of this Agreement, seniority means the Employee's continuous service with the Employer beginning with the date of last hiring as an Employee without seniority and ending when:

(1) The Employee quits or is discharged for cause; or

(2) When an Employee is absent for more than two (2) days without having notified the Employer unless prevented from doing so by good causes; or

(3) When the Employee is laid-off or absent because of illness or other bona fide reason for more than one (1) year in the case of a full-time Employee or six (6) months in the case of a part-

time Employee, or unless the Employer grants a longer leave of absence;

(4) When the Employee fails to report to work promptly on the expiration of any leave of absence unless such Employee secures an extension of such leave of absence with the consent of the Employer.

(5) When an Employee fails to return to work after lay-off within a week after the certified mailing notice of recall.  Any notice required to be given by this Article, shall be considered given when the same has been deposited in the mail addressed to the Employee at his/her last known address as shown by the Employer's record.

(6) An Employee promoted or transferred out of the bargaining unit shall lose seniority after one hundred and eighty (180) calendar days for all purposes, except fringe benefits.  The Company shall notify the Union prior to said promotion or transfer.

B.    Full-time employees laid off because of lack of work when no other full time work is available shall be allowed to bump by seniority, the least senior employee in a lower-rated classification (general duty, service clerk, part-time) where their seniority carries him/her at the applicable rate for that position.  Full time employees laid-off because of lack of work when no other full-time work is available shall be offered part-time work at the rate applicable thereto if part-time work is available even if displacement of part-time employees is required.  A full-time employee who accepts part-time work shall be given preference for re-employment for full time work as if he/she were on layoff.  The employer agrees that it will provide the President of the Union with three (3) copies of written statement of the names and addresses of each person hereinafter employed by it for more than six (6) days.  The Employer agrees that it will provide additional information of bargaining unit employees affected by the layoff to the Union upon request, no later than seven (7) calendar days of the request or no later than thirty (30) calendar days if the request requires the rewriting of computer programs.

C.    The foregoing principles shall apply to part-time Employees in each job classification as a separate seniority unit.

D.
**Section 1:**    The Employer shall continue its efforts to train senior employees to fill higher-rated classifications.  In the matter of promotions, the Employer shall have the right to exercise its judgment on fitness and ability and shall make its determination after giving due regard to seniority and after considering suggestions and recommendations of the Union.

**Section 2:**    Whenever a Full-time job becomes available, the job will be filled through promotion or transfer. The Employer shall have the right to exercise its judgment on qualifications and ability and shall make the determination after giving due regard to seniority.  In instances where qualifications and ability are equal, seniority will be the determining factor.

**Section 3:**    The employee promoted to full-time shall be on probation for a period of 90 days.  If either the employee or Employer should determine that the change is not satisfactory, the employee shall be returned to his former position with seniority and pay as if he/she had never left.

E.     Deleted

F.     Bargaining unit employees shall have priority over non-bargaining unit employees for vacancies in bargaining unit stores provided the Employee is qualified for the vacancy. The position to be filled through promotion will be posted for ten (10) calendar days. In the event the Company is unable to assign the employee awarded the job to the position within twenty-one calendar days of being selected, for any reason, the Employee will receive the pay rate of the position beginning the twenty-second (22nd) calendar day, or their rate of pay, whichever is higher and will receive the difference in travel pay if the new position is closer to the employee's home than their current location. The company will give the Union copies of all postings, names of applicants and the successful applicant. All applicants shall be notified of the results of job postings.

G.     The Employer shall furnish the Union with an up-to-date seniority list for full-time Employees and part-time Employees quarterly on request. When a full-time Employee has had prior continuous service as a part-time Employee before being appointed to full-time and has worked full-time for a continuous period of two (2) months he/she shall be credited for one (1) month of service for each two (2) months of part-time service for the purpose of layoff by seniority, rate classification, vacations, sick leave, life insurance and disability insurance. When the part-time Employee is made a full-time Employee within the same department, he/she is credited with part-time service, one month for each two months of part-time service, for the purpose of lay-off by seniority, rate classification, sick leave, life insurance and disability insurance immediately upon assuming full-time status. These benefits shall not be applied retroactively. When a full-time Employee becomes a part-time Employee, he/she shall retain his/her full length of service for all part-time benefits. Any part-time Employee promoted to full-time after July 31, 1994 shall retain his/her full vacation benefit.

H.     When a part-time clerk is needed, the job will be posted within the store so that all Employees within the store may notify management that they are interested in the position.

I.     Deleted

J.     When a warehouse Employee transfers to the stores, he/she shall be placed at the bottom of the seniority list with no loss of company seniority towards benefits and wages.

## ARTICLE 13
## GRIEVANCE AND ARBITRATION PROCEDURE

Section 1. The Company and Union concur on the usefulness and mutual advantages of providing for the prompt and fair resolution of disagreements that could arise on the meaning and interpretation of this Agreement. The following procedures are intended to be the sole means for the resolution of grievances, which for the purposes of this Agreement are defined as disputes between the Management and the Union or covered Employee(s) concerning the meaning or application of this Agreement. Nothing in this Agreement prevents any individual Employee from personally pursuing a grievance with the Management, provided that the Union has been given a reasonable opportunity to be present at any adjustment of the grievance and provided that any adjustment is consistent with the contract.

Step 1:     An aggrieved Employee or the Union will bring his or her complaint to his or her Store Manager within seven (7) calendar days of the incident or action being complained of, or having reasonable knowledge thereof. The Store Manager will make a good faith effort to resolve the matter within seven (7) calendar days of being notified. If the Store Manager cannot resolve the matter, it will be reduced to writing by the Union and submitted to the Store Manager within five (5) calendar days of the receipt of the Manager's verbal response. The grievance must be signed by the grieving Employee(s) or the Union Representative, and must contain a statement describing the nature of the alleged contract violation and a good faith effort to identify the provision of the contract violation and dates, if known. The Manager will have five (5) calendar days to answer the grievance in writing. Employees may request their Steward to bring the matter to their supervisor's attention on their behalf. It is the intention of the parties to resolve as many grievances as possible at this step.

Step 2:     If no resolution at Step 1, the matter may be submitted to the Regional management representative or his designee within seven (7) calendar days of receipt of the Store Manager's answer.

A Step 2 hearing will be held within ten (10) calendar days from the management representative's receipt of the written grievance. A written response will be given to the Union representative within ten (10) calendar days of the Step 2 hearing.

Step 3: If not settled at Step 2, the matter may be further appealed in writing by the Union to the Company's Labor Relations representative, within ten (10) calendar days from the receipt of the Management's Step 2 response. A Step 3 hearing will be held within twenty-one (21) calendar days of the appeal and may be attended by appropriate representatives for the Union and Company. A written response will be given to the Union within fourteen (14) calendar days of the Step 3 hearing, or within thirty (30) calendar days of the appeal if no hearing can be scheduled. If no answer is given within these time limits, the Union may proceed to the next Step.

Step 4: If not settled at Step 3, the matter may be appealed to arbitration in strict accordance with the procedures for arbitration provided elsewhere in this Agreement.

Section 2. The time limits specified in these grievance procedures are meant to be carefully observed by all parties. Any grievance not handled or appealed within specified time limits at any step will be considered settled on the basis of the Management's last response. Failure of the Management to respond within a specified time limit will allow the matter to advance to the next step. Time limits may be extended only by the mutual written consent of the Company and Union. Unless specifically stated in writing to the contrary, no grievance settlement will be considered to set any precedent or establish any binding practice.

Calendar days shall be exclusive of Saturdays, Sundays and Holidays.

## **ARBITRATION PROCEDURES**

Section 1. Arbitration is the fourth and final step of the grievance procedures. If a grievance is not

settled at Step 3, the Union may submit the grievance to arbitration by written notice to the American Arbitration Association and the Company's Labor Relations Department within thirty (30) calendar days of receipt of the Step 3 answer.

Section 2.  A request for a panel of arbitrators will be sent to the American Arbitration Association. The parties will select an arbitrator from the American Arbitration Association panel by alternately striking a name from the list until only one (1) name remains.  The parties will then notify the American Arbitration Association of the selected arbitrator.  If the final remaining arbitrator is unacceptable to either party, one (1) additional panel may be jointly requested, from which an arbitrator must be selected.

Section 3.  The authority of the arbitrator is expressly limited to deciding if a violation of the Agreement has occurred.  The arbitrator shall have no authority to add to, detract from, or in any way change or alter any of the terms and conditions of this Agreement.  The arbitrator shall give due consideration to the rights of management and shall make no ruling that unduly abridges or restricts management rights or improperly substitutes the arbitrator's judgment for management's.

Section 4.  The arbitrator's decision will be final and binding on all parties provided the decision is made within the authority delegated to the arbitrator by the parties.  The Union and the Company shall each bear one-half (1/2) of the fee and expenses of the arbitrator.  All other expenses will be borne by the party incurring them.  The Company will not be responsible for the wages of any Employees for time lost from work due to preparing for or participating in arbitration proceedings.

Section 5.  The parties agree that neither will use the services of legal counsel during arbitration proceedings without first having given advance notice to the other of such intent.  The parties further agree not to withhold relevant information from the other during the preliminary grievance steps in a good faith effort to resolve disagreements without arbitration.

Section 6.   Arbitrator selection must be made within 60 days of the date of submission to arbitration, and a hearing must be scheduled for hearing within one year from the date of submission to arbitration by the Union.  Any arbitration case that does not meet these requirements shall be considered to be resolved and shall not be further processed by the parties.

## ARTICLE 14
## STEWARDS

A.  The Union shall have the right to have one (1) steward in each of the Employer's stores covered by this Agreement, and one for store maintenance.  The Union may designate an alternate steward in each store; the alternate stewards shall be recognized by the company in the absence of the regular steward.  A second alternate in the stores may be designated if so desired by the Union.

B.  In addition to their seniority rights as regular Employees, Stewards, Alternate Stewards and Union Officers shall have top seniority in layoffs due to lack of work within their respective store and classification, or within their warehouse shift.

C.  No Steward or Alternate shall be transferred unless such transfer is mutually agreed upon

between the Employer and the Union.  No more than one Steward or Alternate per department shall be protected.

D.  In no instance shall the Steward be discriminated against for discharging duties.

E.  The Union shall supply the Employer, upon request, with a list of the Stewards and the store locations.  The Union will notify the Employer of all changes.

F.  The Steward shall not in any way interfere with the Manager in his/her operation of the store.

G.  The Union agrees to do everything within its power through advice, instruction, and examples to obtain compliance by its members with the obligations undertaken in this Agreement. The Employer agrees to do everything within its power through advice, instruction, and examples to obtain compliance by its Supervisors with the obligations undertaken in this Agreement.

H.  The Union shall, within a reasonable period of time, be notified in writing of all suspensions and discharges after the probationary period.

I.  The Union will conduct an annual seminar for stewards to be scheduled on a mutually agreeable date, which shall be a Monday, Tuesday or Wednesday and which shall not be in the week before a holiday.  One steward per store and one steward for store maintenance will receive one day off with pay to attend the seminar.  The Employer will pay all said individuals.

## ARTICLE 15
## NO STRIKE - LOCKOUTS

A.  It is mutually agreed by the parties hereto that throughout the life of this Agreement there shall be no strikes, lockouts, picketing, boycotts, or stoppage of work, and that any difference or misunderstanding as to meaning or application of this Agreement which may arise between the contracting parties shall be amicably adjusted by and between the parties themselves under the grievance procedure herein above provided.

B.  In the event of the threat of, preparation for, or occurrence of any unauthorized strike, walkout, picketing, boycott, or stoppage of work, the Union and all of its officials will promptly take every possible step to prevent and to stop such action by any of its members.

C.  It is further mutually agreed that the Employer shall have the unqualified right to take any action it deems advisable, including discipline and discharge, against any Employee engaging in, participating in, encouraging, aiding and abetting any such unauthorized strike, walkout, or stoppage of work.  However, any issue of fact as to whether or not any particular Employee engaged in, participated in, or encouraged any strike or work stoppage, may be subject to the grievance procedure established by Article 13 hereof.

D.  This Article shall not be construed so as to preclude the Union from engaging in lawful organizing activities at non-Union stores.

## ARTICLE 16
## JURY DUTY

Any full-time Employee who is called to serve for jury duty shall receive pay on actual hours worked for the Employer. If this pay, together with his/her jury duty pay, does not equal his/her regular five (5) day weekly rate of pay, the Employer shall make up the difference, providing he/she works for the Employer during such hours when, because the jury is not sitting, he/she is reasonably available for work. However, the Employee shall not be required to work the sixth day if he/she serves on Jury Duty and/or works five (5) days or more in a regular week and he/she shall not be required to work the fifth day if he/she serves on Jury Duty and/or four (4) days or more in a holiday week. An Employee on jury duty shall be granted holiday pay as if he/she were working regularly. Part-time Employees shall receive like benefits on a pro-rata basis. Days spent on jury duty shall be counted as eight hours worked for purposes of overtime eligibility. Part-time Employees will be paid jury duty pay, calculated on the same basis as holiday pay, for days served on jury duty.

## ARTICLE 17
## MISCELLANEOUS PROVISIONS

**Section 1.** No Employee shall be obligated to use a privately owned vehicle for Company business.

**Section 2.**

A. Employees injured while at work and requiring outside medical service must first notify the Store Manager, and shall be paid for time lost while visiting the doctor. If an Employee is required by the doctor to be absent from work, he/she shall be paid for the entire day, including lost overtime, if the injury occurs after the overtime begins.

B. Thereafter, the Employee shall be paid for time lost while visiting the doctor during his/her working hours for a scheduled appointment provided the Employee returns to work to complete his/her scheduled hours.

**Section 3.** The Employer shall not enter into individual Agreements with Employees with respect to terms and conditions of employment.

**Section 4.** Safety Committee Meetings shall be held monthly in the stores. The Store Steward may attend the monthly store Safety Committee Meetings. The Company will continue to make reasonable provisions for the health and safety of its Employees during the course of their employment and will continue to comply with all applicable state and federal health and safety regulations or codes and they shall be the minimum acceptable standards. Management and Employees will observe the safety rules and will cooperate in the prevention of accidents and injuries. Stewards will be informed of the results of all monthly store safety, and OSHA inspections.

**Section 5.** One bulletin board in each store shall be designated as Union bulletin boards.

**Section 6 A.** If an Employee is called in on his/her day off or temporarily transferred to another store farther from his/her home than is his/her home store he shall be paid the Internal Revenue

Service allowable deduction for each additional mile traveled, except if the transfer is to avoid a layoff, or is at the Employee's request.

**Section 6 B.**    No Employee shall be permanently or temporarily transferred more than 30 miles from his/her home store without his/her consent, except that transfers to staff new stores where the Union is recognized, and the first backfill, made during a three month period at the time of a store opening will be subject to a thirty mile limit, provided that Employees so transferred shall thereafter be paid the Internal Revenue Service allowance per mile for miles in excess of 30.  Thereafter the Employee's former store shall be considered his/her home store until he/she is retransferred back to within thirty miles of the home store.

**Section 7.  Deleted**

**Section 8.**    Warning and suspension shall not be used for disciplinary purposes after 12 months.

**Section 9.**    Nothing in this Agreement shall prohibit vendors and others from supplying and stocking their own products.  It shall not be a violation of this provision to allow not more than two non-unit management trainees, per store, to perform bargaining unit work.  Managers and Supervisors will be permitted to perform work normally assigned to bargaining unit members in the case of emergencies, safety considerations, and training and learning, to meet customer service needs.

**Section 10.**    Covers will be provided for all cashier tills.  The Company will provide an emergency personal alarm device to be used by Employees who are gathering carriages late at night.  The alarm will be the property of the Company and will be issued and returned to the Checkout Assistant who is assigning carriage duty.

**Section 11.**    The Employer will not subject any Employee to a lie detector test, or request, directly or indirectly, any Employee to take a lie detector test.  This does not apply to lie detector tests administered by law enforcement agencies.  The Employer has the right to subject candidates for promotion to a drug screen, subject to applicable state and federal law.

**Section 12.**    It shall not be a violation of this Agreement for the Employer to allow third party operation of leased departments, within its stores, staffed by employees of the leased operator, to operate specialized departments that can't be operated by Shaw's (e.g. banks, travel agencies, hair salons, etc.). If Shaw's assumes the operation of a leased department, the work in that department will be performed by Employees covered by this Agreement.

**Section 13.**    Store cards or decals of the Union shall be displayed in a prominent place in all of the Employer's stores covered by this Agreement, but these cards or decals shall remain at all times the property of the Union.

**Section 14.**    The Employer will notify the Union in writing of all terminations, suspensions, job postings and policy changes that affect the bargaining unit.

**Section 15.  Safety and Health Committee:** The Employer will cooperate with the Union in the joint operation of the Safety and Health Committee, which meets at least quarterly, which shall

consist of members of Management and Union Representatives.  The Employer agrees to pay all Employees their rate of pay to attend seminars that are developed by the Committee.

**Section 16.**    Grocery Employees are entitled upon request, to one set of kneepads per contract period.  They must wear the kneepads at work.  If the pads are not worn at work, they must be returned to the Company.  The Company will replace broken or worn kneepads, through normal wear and tear, upon presentation of such kneepads by the Employee.  Lost or stolen kneepads will be the responsibility of the Employee.

**Section 17.    Respecting demotions:**  The Store Manager or Supervisor will ask the Employee if he/she wants the Steward present at the stage where the Employee is being told that absent improvement he/she will be demoted and will honor the Employee's desire.  The Steward will be present at the time of demotion.

**Section 18**.    Deleted

**Section 19.**    Deleted

**Section 20.**    The Employer and the Union agree that, in accordance with applicable state and federal laws, neither party will discriminate against any person because of race, color, sex, creed, marital status, sexual orientation, age, national origin, religion, mental or physical disability, or union membership.  The Employer and Union recognize that it is their obligation to engage in good faith attempts to resolve issues of alleged discrimination, including accommodation for mentally or physically disabled members of the bargaining unit.

**Section 21.    Rescue Squad**

The following statements are a list of guidelines for the Rescue Squad that the Shaw's Management Team intends to use in the management of the squad and will make every effort to abide by:

(a)    The Rescue Squad will be staffed by volunteers.  When an opening becomes available on the Rescue Squad, the Store Manager will poll their Employees and Employees will be assigned to the Rescue Squad on a voluntary basis senior by choice, junior by force.

(b)    The store that a Rescue Squad Employee comes from will remain his or her home store.  In the event that there is no Rescue Squad work on a given day, the Rescue Squad Employee will be given an assignment.

(c)    If an Employee on the Rescue Squad decides that they no longer want to be on the Rescue Squad, they may inform the Rescue Squad Manager of their desire to return to a permanent store, they will be permanently reassigned within 30 days to their home store or to a store not more than 20 miles from their home store and to the last position they held.

(d)    The regular hours for a Rescue Squad Employee based on an 8 hour day will be between 6:00 a.m. and 5:00 p.m. and one evening on a weekly basis.  Based on a weekly placement, the Employee will work a normal schedule by contract.

(e)     Rescue Squad Employees shall be paid mileage based on the difference between the distance from their home store and from their home to their daily assignment.  We will compute that on a daily basis and not subtract for lesser distances.  The Employee can select a home store for travel purposes and be paid mileage from that store within their district.

(f)     The Rescue Squad Employees schedule will be posted by 1:00 p.m. on Friday in the store where they are assigned.

(g)     Rescue Squad personnel will be assigned to a Store Manager as designated by the Employer.   In the event of any type of disagreement Rescue Squad personnel should deal exclusively with that Store Manager.  In the event of any type of disagreements with their respective managers that cannot be readily resolved, Rescue Squad Employees should seek out the respective Union Stewards.

(h)     The above guidelines do not exclude the Union or the Employees from their rights under the Collective Bargaining Agreement and policies or procedures agreed to by the Company and Union.

## Section 22.    Lateral Store Transfer

This agreement does not restrict the Company in transferring of Employees in accordance with the present Collective Bargaining Agreement.  The purpose of this agreement is to provide a vehicle to transfer Employees closer to home.

(a)     Any qualified non-classified Employee who lives at a distance of 30 or more miles from their home to their present store is eligible to request a transfer closer to their home.

(b)     The Company will provide a request form every six (6) months, in September and March, with a two (2) week response period, where eligible Employees can request a transfer to not more than four (4) stores in a particular geographical area.

(c)     When a vacancy occurs, the Company will refer to the requests of transfer and fill the position by the most senior qualified person requesting that store.  The Company will back fill the vacant positions until all positions are filled until there is a vacancy, at which time that position will be posted.  An Employee that fills a newly bidded position will have a six (6) month waiting period before that Employee goes on the list.

(d)     Employees hired or transferred to a new store opening will have to wait one year to become eligible for the benefits provided under provision (a) of this agreement.

## ARTICLE 18
## MEAT DEPARTMENT

A. The Employer and the Union shall review the number of and activities of the Apprentice Meat Cutters so that Apprentices shall have an opportunity to progress in all phases of the meat

business.

B.  An Employee promoted to Apprentice Cutter shall maintain his/her rate or receive the starting rate listed in the Apprentice schedule, whichever is higher.  If his/her rate is higher than the starting rate of Apprentice, he/she shall receive his/her next increase in pay after having served the required period of time in accordance with the Apprentice Progression Scale herein and shall thereafter receive the applicable progression rate and he/she shall receive all general increases.

C.  Store Manager will notify both Management and Union when starting an Apprentice Meat Cutter.

D.  Meat room cleaning Monday through Friday will normally begin not before 8 P.M. and Saturday not before 12 noon except days of early closings and day before holidays where Saturday schedule will be followed.

E.  Apprentice Meat Cutters may cut on Sundays, at the Meat Cutter rate, if no meat cutters are available.  The Company will honor its past practice as to only Meat Cutters and apprentices doing production cutting. Grinding of meat will not be a regularly scheduled part of the work of the clerk, except at the end of the shift if no Meat Cutter is available or in case of emergency, to meet customer service needs or for the efficient completion of work.

F.  The Union and the Company agree that the Company may ask Meat Cutters to come out of the meat room, on a voluntary basis, as needed. It is also understood that if there are no volunteers, then first Meat Cutters in the store by inverse seniority, will be reassigned on a temporary basis to work other departments within their regular scheduled hours and maintain their pay rate, and then the Stewards and Alternate Stewards, and then the Assistant Meat Managers and the Meat Managers, who shall be the last employees to be reassigned out of the meat room.

## ARTICLE 19
## MAINTENANCE

**A.  Maintenance Provisions:**

1.  When maintenance Employees are called in, they will be paid a minimum of four (4) hours at one and one-half (1 1/2) times their regular rate of pay but such hours worked shall not be counted as hours worked toward figuring weekly overtime.  The Union agrees to give the Company the right to give maintenance Employees, called in on a service call, additional work if the service call is completed within the 4 hour minimum.

2.  Overtime shall be awarded based on geographic area of coverage and skill set.  The Company agrees to pay a minimum of one (1) hour at the appropriate rate for any work performed in regards to telephone or computer network after the regular shift.

3.  The Company will provide winter clothing, including: thermal vests, coveralls, gloves, boots, rain gear and coats.  The Company also agrees to replace these items listed above when they become worn out, as needed.   The Company and the Union will establish one standard name of

clothing for these purposes.  The Company will replace an Employee's safety shoes during the contract year if the shoes are damaged due to workplace hazards and are no longer functional.  Shoes worn out through normal wear and tear will not be replaced.  The Employer will reimburse store maintenance employees for the purchase of approved work boots up to $125.00 annually.

4.  A.  Maintenance Employees shall have a separate seniority unit.  Employees in maintenance as of July 27, 1979 will have their date of hire as their seniority date.  Employees entering the Maintenance Department, thereafter, shall have the date of entry as their seniority date.  This seniority is for competitive purpose only.  (Choice of shifts, vacation, day-off).

B.  Maintenance Employees who leave the Maintenance Department will go to the bottom of the store seniority list.  Company seniority will be used for benefits.

5.  The work week for Maintenance Employees hired or appointed prior to July 27, 1985 shall be forty-two and one-half (42 1/2) hours per week, five (5) days, time and one-half (11/2) after eight (8) hours in a day, forty (40) hours in a week, thirty-two (32) hours in a holiday week, and twenty-four (24) hours in a week with two (2) holidays.  Maintenance Employees hired or appointed after July 26, 1985 shall work eight (8) hours a day, forty (40) hours a week; thirty-two (32) hours in a holiday week; twenty-four (24) hours in a week with two (2) holidays.  The Union agrees to allow the Company to offer a 4 day 10 hour per day work week schedule to existing Maintenance Employees, on a voluntary basis only.  New hires in the Maintenance Department may be scheduled on a 4 day 10 hour per day work week schedule.  Once a new hire is put on this 4x10 schedule, the split shift will be eliminated in the Maintenance Department.

6.  Maintenance Employees shall be provided with safety prescription lenses as needed but no more than one (1) pair per year.  The Employer agrees to pay an amount which would be paid to the Company eye doctor to a private eye doctor to pay for photogray lenses if prescribed by a doctor and for safety frames if needed, subject to OSHA standards.

7.  **Tools:**  The Company will replace broken or worn tools upon presentation of said tools and lost tools will be replaced at the discretion of the Maintenance Manager.  The Company will continue its practice of supplying maintenance personnel with specialty and power tools.

8.    Deleted

9.  a.  The company agrees to provide training as needed on updated equipment or any job related changes which affect maintenance Employees.

b.  The company shall continue to offer training and education for maintenance Employees who desire to be certified in the trades:  HVAC, welding, plumbing, electrical, refrigeration, etc.

10.    Deleted

11. The Company will provide two way communication devices for all maintenance vans.

12. All maintenance Employees will wear only Company provided uniforms and approved work shoes.  The Company will provide clothing that is weather appropriate.

13. All full-time maintenance vacations shall be calculated based on average hours paid during previous calendar year but not less than forty (40) hours per week.

# ARTICLE 20
# SERVICE CLERKS

It is not the intention of the Service Clerk to displace an existing General Duty Clerk. However, the Employer does have the right to transfer General Duty Clerks to vacancies and new stores, and back fill those positions. No existing General Duty Clerk will be displaced for a full-time Service Clerk.

a. As long as current staffing requirements for General Duty Clerks are met, a service clerk can be assigned to work as needed in any department where they are needed
b. Service Clerks cannot stock regular grocery.
c. Service Clerks cannot receive.
d. Service Clerks may volunteer to order and/or supervise.
e. Cashier/Price Change Service Clerks who volunteer to supervise shall receive the C.O.A. differential for all hours performing that function.

The full-time Service Clerk position performs functions in store departments as follows:

**BAKERY**
- service clerk will not be utilized in bakery unless three general duty clerks are assigned to the department including the manager and assistant
- perform any function required in the department

**DELI**
- service clerk will not be utilized in deli unless two general duty clerks are assigned to the department including the manager and assistant
- primarily service customers
- stock service and self service cases
- Service Clerks in the deli may crossover into seafood
- perform any function required in the department

**SEAFOOD**
- primarily service customers
- stock service and self service cases
- in departments with no seafood manager there will be at least one full rated general duty clerk before there will be full-time service clerks
- Service Clerks in seafood may crossover into the deli
- perform any function required in the department

**MEAT**
- may perform functions not performed by meat cutters

- perform any function required in the department

**PRODUCE**
- service clerk will not be utilized in produce unless three general duty clerks are assigned to the department including the manager and assistant
- perform any function required in the department

**FLORAL**
- perform any function required in the floral department

**GROCERY**
- priorities generally include high volume items that require restocking on less than a 24 hour cycle such as: bread; milk; soda; chips; snacks
- perform any function required in the department

**CASHIER/PRICE CHANGE**
- Can perform price checks
- Can perform duties associated with the scan guarantee-change price in system if necessary, change price on the stock on the shelf if necessary, change shelf tag
- Can put up price signs at the time of the price change
- perform any function required in the department

**ASSISTANT SRO SERVICE CLERK**
- The store can appoint, in accordance to the posting procedure, an Assistant SRO Service Clerk to assist the full-time SRO General Duty Clerk to perform any functions pertaining to SRO.

**DUTIES OF SERVICE CLERKS**
Service Clerks cannot work between the hours of midnight and 5:00 A.M.
Service Clerks cannot stock regular grocery.
Service Clerks cannot receive.

If there is an emergency situation (the demands of the business dictates immediate attention) a Service Clerk can work in a department other than their assigned department if there are no other qualified Employees working at that time and will be paid the Service Clerk rate of pay except when replacing a full-time General Duty Clerk they will receive the full-time General Duty Clerk rate of pay for the amount of time they are performing that duty. The Union must be notified of this.

1. When Management is aware of a shift that needs to be filled (sick call, vacation, etc.) in a department, a Service Clerk can work in a department other than their regularly assigned department.
2. If there is an emergency situation (a load arrives late) and there are no qualified Employees working at that time, a Service Clerk may be used to pull a load and will be paid the full-time General Duty Clerk rate of pay for the amount of time they are performing that duty.

Service Clerks are permitted to unload live loads.

Department Service Clerks can work other departments in an emergency (the needs of the business dictates immediate attention) if there are no other qualified Employees working at this time and will be paid the Service Clerk rate of pay except when replacing a full-time General Duty Clerk they will receive the full-time General Duty Clerk rate of pay for the amount of time they are performing that duty.  The Union must be notified of this.

## ARTICLE 21
## MANAGEMENT

The Employer retains the sole right to manage its business including, without restricting the foregoing, the rights to decide the number and location of its warehouses and stores; the equipment to be used; the functions to be performed; the products to be manufactured, purchased, merchandised or otherwise dealt in; the method of operations; the schedule of operations, the processes of handling, manufacturing, of assembling; and the control of raw materials, semi-manufactured and finished goods which it may determine to incorporate into the products manufactured, purchased, merchandised or otherwise dealt in by it;  to maintain in order and efficiency in its operations; to hire, assign and promote Employees; to lay-off, recall and transfer Employees for legitimate business reasons; to discipline; demote and discharge Employees for proper cause; and to determine the starting and quitting time and the number of hours to be worked; subject only to such regulations and restrictions governing the exercise of these rights as are expressly provided in this Agreement.

## ARTICLE 22
## SCOPE OF AGREEMENT

All of the contractual commitments of the Employer with reference to all matter of wages, hours, and other conditions of employment have been integrated and incorporated into this Agreement - those matters not specifically referred to herein having been raised and disposed of - provided, however, that nothing in this Agreement shall prohibit, the Employer from granting the Employees covered hereby more favorable wages, hours or other conditions of employment than those which it is contractually bound to provide hereunder in the event that, at its sole discretion, the Employer determines to do so.

## ARTICLE 23
## SEPARABILITY AND SAVING PROVISION

If any Article or Section of this Contract, or of any Riders thereto, should be held invalid by operations of law or by tribunal of competent jurisdiction, of or compliance with or enforcement of any Article or Section should be restrained by such tribunal pending a final determination as to its validity, the remainder of this Contract and of any Rider thereto, or the application of such Articles or Section to persons or circumstances other than those as to which it has been held invalid, or as to which compliance with or enforcement of has been restrained shall not be affected thereby.  In the event that any Article or Section is held invalid or enforcement of or compliance with which has been restrained, as above set forth, these parties affected thereby shall enter into immediate collective bargaining negotiations upon the requests of either party, for the purpose of arriving at a

mutually satisfactory replacement of such Article or Section during the period of invalidity or restraint.

# ARTICLE 24
# MILITARY LEAVE

**Section 1. Emergency National Guard and Reserve Duty:**
An Employee called to National Guard and/or Reserve Duty because of local emergency by decree of the State shall suffer no loss of basic pay.  The Employer shall make up the difference between the Employee's regular weekly pay and military pay.

**Section 2.** An Employee shall not be required to take Military Training Duty as his/her earned vacation.  If a holiday provided for in this Agreement falls during an Employee's two (2) week training period, the week immediately following shall be that Employee's holiday work week.

**Section 3.** An Employee shall not suffer any loss of pay for attending two week summer duty.  The Employer shall make up the difference between the Employee's regular weekly pay and military pay.

# ARTICLE 25
# DURATION

This Agreement shall become effective as of August 1, 2004 and shall remain in full force and effect through August 2, 2008 and shall thereafter be continued for successive one year periods unless notice in writing, by certified mail, is sent by one party to the other of the desire to terminate or modify this Agreement at least sixty (60) days prior to the next expiration date on this Agreement.  Upon receipt of any such notice, a conference will be arranged for within ten (10) days.

IN WITNESS WHEREOF, the parties hereto caused their hands and seals to be placed hereon by their duly authorized representatives and officers this 13th day of August, 2004.

SHAW'S SUPERMARKETS, INC.  (Southern Region Stores and Store Maintenance)

_____
Eric J. Nadworny, Vice President, Associate and Labor Relations

UNITED FOOD AND COMMERCIAL WORKERS UNION LOCAL 791, AFL - CIO

_____
Russell Regan, President

Russell Regan, President

Frank J. Runey, Secretary / Treasurer
Mike Fox, Director of Collective Bargaining / Union Representative
Peter Derouen, Recorder
Lynette Chancholo, Store Vice President at Large
Kurt Stigelman, Vice President / Meat Department
Richard Cerci, Vice President / Full-Time Store Employees
Mary Tamulevich, Vice President / Part-Time Store Employees
Robert Anderson, Union Representative
Patricia Benner, Union Representative
Mary McClay, Director of Grievance and Arbitration

**SIDE LETTER ONE**                                                          **July 31, 1994**

The Union and the Company agree that the following shall be an addendum to the current collective bargaining Agreement:

1. Any member of the Union who is elected or appointed to a Union office, Business Agent, Office Staff, Delegate to a Union Convention, or who is assigned to participate in negotiations, grievance or arbitration shall be granted a leave of absence from the Company for the term of office and any subsequent terms.

2. The Company agrees that any full-time Officer granted a leave of absence in accordance with Paragraph 1, above, who leaves office for any reason except for moral turpitude, shall return to the Company and be reinstated the last held position, at the current rate with no loss of seniority or accrued benefits, providing that an application for said return is made within thirty (30) days following the leaving of office.

3. The Company agrees to allow the Union to purchase, at the applicable group rate, all applicable health and life insurance and pension benefits.

4. Duly authorized representatives of the Union shall be granted reasonable access to all stores and maintenance facilities contained within the collective bargaining unit to conduct Union business provided that such access shall not interfere with production or with Employees while at work.

5. Weeks in which an Employee was temporarily absent due to Union business will not be included in the base for calculating holiday or vacation pay, provided that the payroll department receives notice, at least one week prior to the vacation or holiday week, listing the weeks which should not be included in the calculation. In the event that temporary time off for Union business would have resulted in additional pension credit if the time had been spent working for Shaw's, the Union may purchase additional credits, in quarterly increments, for the affected individual by making a contribution to the Fund in the amount of the cost of the purchased credit.

**ADDENDUM ONE**

6.      Proposals:  All proposals by both parties not granted were withdrawn as if not proposed.

7. **Pension:**

The Pension Plan will provide for early retirement at age 62 without penalty, for retirements after November 6, 1988, and will provide that an Employee shall be credited with a full year of service in any year in which he or she works 1560 hours.  The pension plan documents will be amended to provide for retirement at age 55 with an actuarially reduced benefit, to allow for a 100% joint and survivor annuity option, and to provide for a 100% joint and survivor annuity default for pre-retirement death benefit.

8. **New Stores**:

When the Employer opens new stores within the geographic area described in Article 1, the Employer will allow access within the store prior to opening during the hiring process, will remain neutral regarding union representation, and will recognize the Union and apply the contract when a majority of Employees have authorized the Union to represent them. Neutrality shall not be construed to prohibit truthful statements by the Company, provided that the Employer will not advocate against union representation.

9. **Maintenance Clothing:**

When the present clothing contracts expire for store and warehouse maintenance Employees, the Company will check with suppliers as to the availability of light and heavy clothing and, to the extent available from suppliers, the Company will allow maintenance Employees to make seasonal selections, it being understood that the Employee is held to the selection for a season.

21.  The following 1985 and 1991 understandings are hereby continued but shall not be subject to arbitration.

**1985 SIDE AGREEMENTS**

**ARTICLE 4 HOURS**

**Section 3B:**  Managers will be sensitive to the needs of senior citizens and the hours they are allowed to work.

**Section 3C:**  The Company will be sensitive and try to avoid scheduling a part-time Employee more than five days but reserves the right to schedule six days when it must be done.

**Section 3C:**  The Company will be sensitive to the desire of senior part-time Employees for more day hours.

**Section 5:**  Full-time night stocking Employees, night cleaners and night bakery Employees (as of 7/27/85) will not be required to work more than two (2) evenings per week in other classifications.

**Section 5:**  Present night stocking crew will not be forced to evenings and lose the premium.

**Section 5:**  Full-time night stocking Employees that want to go to evening stocking will have a preference but lose the premium.

**Section 8A:**  The Company will be sensitive and give reasonable notice to Employees.

**Section 8:**  Nine hours off between scheduled shifts: the Company agrees they will be sensitive in this area (unless the Employee agrees).

**Section 8:**  The Company will undertake some sensitivity in the desire of senior cashiers not to pack.

## ARTICLE 6
## HOLIDAYS AND SUNDAYS

**Section 1:**  The Company will be sensitive to those Employees who demonstrate a sincere interest in the cause represented by the observance of Martin Luther King Day, the day off without pay.

**Section 4:**  The Company agrees that the Manager will be sensitive to Employees who want to work not more than four days in a holiday week and not more than three days in a week with two holidays.

## ARTICLE 7
## VACATIONS

**Section 3:**  The Company has agreed that Store Managers will not automatically deny vacations during holiday weeks.  We have agreed that Store Managers will look at each vacation request as a separate entity and where practical we will allow vacations during those holiday weeks.

## ARTICLE 12
## SENIORITY

**Respecting Promotions:**  The Company will continue to post jobs as is the present practice in the stores.

## ARTICLE 14
## STEWARDS

The Company agrees to continue the present practice for Union Representatives to be excused from work for Union business.

## ARTICLE 17
## MISCELLANEOUS PROVISIONS

**Section 5:**  The Company will be sensitive to the Union's interest in having bulletin boards in conspicuous places.
**Section 6B:**  The Company will not make any transfers which circumvent the purpose of this language**.**

## FURTHER SIDE AGREEMENT CONCERNING
## ARTICLE 17:

1.  The Company agrees to abide by the Union and Company Agreement, any Union member training for a management position cannot discipline an Employee until promoted.

2.  The Company also agrees to abide by the Union and Company Agreement, that a department head (or Union member) shall not discipline an Employee.

3.  Carriage duty will be assigned to packers by one (1) hour intervals and half (1/2) hour intervals in inclement weather.

## 1991 SIDE AGREEMENTS

The Union will be sensitive to the Employer's difficulties in staffing stores on Sunday and will work with the Employer to insure that this problem does not adversely affect customer service.

## 1994 SIDE AGREEMENTS

**10.    Benefit Modifications**
Shaw's and Local 791 have discussed the following - modifications in benefit programs provided by Shaw's to Employees covered by the collective bargaining Agreement and that Local 791 has confirmed that it has no objection to the implementation of the following benefit modifications:

(a)  **Special Joint and Survivor Annuity for Married Member:** A married member who retires or terminates employment after July 31, 1994 may elect to receive the monthly payments on the basis of a Special Joint and Survivor Annuity.  The Special Joint and Survivor Annuity shall have all of the provisions of the Qualified Joint and Survivor Annuity described in Section 6. 6(a) with the additional provision that in the event that, after the Annuity Starting Date, the Member's spouse shall predecease the Member, the monthly annuity payable to the Member shall then be increased to be the amount which would have been payable monthly if the Member had initially elected to receive his benefits on a single life basis.

11**.  Sunday Work**
It is recognized that adequate staffing of the stores on Sunday is in the interests of both the Employer and the Union.  Therefore, Employees should be encouraged to make themselves available for Sunday work.
In the event that the store manager is unable to properly staff his store for a Sunday, the Union will provide guidance and assistance to fill the unfilled shifts and schedules by encouraging Employees to work.

13. **Outside Contracting**
The Company agrees to follow its current practice in regards to additional work for maintenance

department personnel, but the Union acknowledges that there may be times when an outside contractor must be called upon because of safety, technical knowledge and timing.

## 1997 SIDE LETTER

1**. Express Terminals**

The Company will be sensitive to the interests of cashiers in not being assigned to the express terminal in increments of longer than one hour and in rotating such assignments among all cashiers.

4.   Work on Sundays and Holidays shall be voluntary except that Employees hired after July 27, 1997 may be compelled, in inverse order of seniority, to accept such work if there are insufficient volunteers with the necessary qualifications.  The Company agrees to comply with state laws regarding Sunday and Holiday work.

**5. Maintenance Employees Connecticut**

Shaw's will recognize Local 791 as the bargaining representative of the Connecticut Store Maintenance Employees.  Those Employees will be covered by the provisions of this Agreement, including the maintenance job security provisions, and the parties will make appropriate insurance arrangements.

# APPENDIX A

### 1.    Wage Rates and General Increases

| Level | Positions | | 2004 ** | 2005 ** | 2006 ** | 2007 ** |
|---|---|---|---|---|---|---|
| 1 | P/T Packer & Porters | Minimum Starting Rate | $6.75 | $6.75 | $6.75 | $6.75 |
| | | 30 days after hire | 0.25 | 0.25 | 0.25 | 0.25 |
| | | General Wage Increase | $0.25 | $0.20 | $0.30 | $0.175 |
| | | | | | | $0.175 |
| 2 | P/T Clerk , P/T Reclaim | Minimum Starting Rate | 7.25 | 7.25 | 7.25 | 7.25 |
| | | 30 days after hire | 0.25 | 0.25 | 0.25 | 0.25 |
| | | General Wage Increase | $0.25 | $0.20 | $0.30 | $0.175 |
| | | | | | | $0.175 |
| 3 | FT Service Clerk, F/T Packers & Porters, Secondary Floor Care, Meat Room Cleaner, Pharmacy Tech  (F/T & P/T) | Minimum Starting Rate | 9.00 | 9.00 | 9.00 | 9.00 |
| | | 30 days after hire | 0.50 | 0.50 | 0.50 | 0.50 |
| | | General Wage Increase | $0.305 | $0.305 | $0.305 | $0.305 |
| | | | $0.320 | $0.320 | $0.320 | $0.320 |
| 4 | Full-time General Duty Clerk, F/T Reclaim | Minimum Starting Rate | 11.00 | 11.00 | 11.00 | 11.00 |
| | | 30 days after hire | 0.50 | 0.50 | 0.50 | 0.50 |
| | | General Wage Increase | $0.305 | $0.305 | $0.305 | $0.305 |
| | | | $0.320 | $0.320 | $0.320 | $0.320 |
| 5 | Classified Full-time Clerk (includes Receiver, SRO, Primary Floor Care, Asst. Crew Chief, Reset Team Leader, Asst LaCarte Mgr, Asst C/O) | Minimum Starting Rate | 14.50 | 14.50 | 14.50 | 14.50 |
| | | 30 days after hire | 0.50 | 0.50 | 0.50 | 0.50 |
| | | General Wage Increase | $0.305 | $0.305 | $0.305 | $0.305 |
| | | | $0.320 | $0.320 | $0.320 | $0.320 |
| 6 | Meat Cutter, Meat Second Person | Minimum Starting Rate | 18.00 | 18.00 | 18.00 | 18.00 |
| | | 30 days after hire | 0.50 | 0.50 | 0.50 | 0.50 |
| | (A meat cutter promoted to Meat 2nd Person will receive wage increase of $1.00 per hour) | General Wage Increase | $0.305 | $0.305 | $0.305 | $0.305 |
| | | | $0.320 | $0.320 | $0.320 | $0.320 |
| 7 | Assistant Department Manager (also includes Seafood Mgr., LaCarte Mgr., Crew Chief, Service Desk Mgr, Asst. Cust. Service Mgr) | Minimum Starting Rate | 15.00 | 15.00 | 15.00 | 15.00 |
| | | 30 days after hire | 0.50 | 0.50 | 0.50 | 0.50 |
| | | General Wage Increase | $0.305 | $0.305 | $0.305 | $0.305 |
| | | | $0.320 | $0.320 | $0.320 | $0.320 |
| 8 | Department Manager  (also includes Produce, Bakery, Deli, Seafood/Deli, Check Out) | Minimum Starting Rate | 17.00 | 17.00 | 17.00 | 17.00 |
| | | 30 days after hire | 0.50 | 0.50 | 0.50 | 0.50 |
| | | General Wage Increase | $0.305 | $0.305 | $0.305 | $0.305 |
| | | | $0.320 | $0.320 | $0.320 | $0.320 |
| 9 | Customer Service Mgr., Grocery Mgr., Meat Mgr., Relief Mgr., Management Trainee | Minimum Starting Rate | 18.00 | 18.00 | 18.00 | 18.00 |
| | | 30 days after hire | 0.50 | 0.50 | 0.50 | 0.50 |
| | ( A Meat 2nd Person promoted to Meat Mgr. will receive wage increase of $1.00 per hour) | General Wage Increase | $0.305 | $0.305 | $0.305 | $0.305 |
| | | | $0.320 | $0.320 | $0.320 | $0.320 |

** -    *First increase on 1st Sunday in August;  Second increase on 1st Sunday in February*

Promotion will result in wage that is no less than the minimum for the new level or $1.00 for promotion to full-time position or $.50 for promotion to part-time position.

Section 2.  Fill in pay

Where there is no Department Manager or Assistant Department Manager running a department, and a Full time Clerk is designated by the Company to run the department, or an Assistant Department Manager is designated to run the department in the absence of the Department Manager, that individual shall receive the base rate for the position, or an additional amount of $8.00 per day ($40.00 per week) premium, whichever is greater, for all full shifts running the department.

Section 3.

 The Employer may institute differential pay increases for part time clerks in hard-to-staff departments in a store, such as Deli.  Part time employees shall receive the pay differential for all hours worked in the department with the differential.

Section 4.  Non-benefit rate for part time clerks

Terms of the program:
   a.   Offered on an individual store basis to part-time clerks
   b.   Must be 18 years of age or older to apply
   c.   Mutually agreed to by manager and employee
   d.   Most senior applicant selected
   e.   While in the program, time does not count toward service eligibility for time off and health & welfare benefits, except for Retirement
   f.   While in the program seniority will accrue for all purposes other than benefits
   g.   Time before or after the program does count toward eligibility for benefits
   h.   Must be regularly scheduled to work at least 25 hours per week
   i.   Must be available to work Saturdays, Sunday and holidays
   j.   Non-benefit rate is $10.00 per hour

Section 5,6: deleted

**Section 7.**

Premiums and Differentials:

FULL-TIME NIGHT STOCKERS:
Hired or appointed prior to 7/27/82 - 75 cents per hour premium for all hours worked including Monday inventory provided all other hours are night stocking.

Hired or appointed after 7/26/82 - 75 cents per hours premium for hours worked between 11:00 PM and 7:00 AM.

PART TIME CHECK OUT ASSISTANT:   40¢ per hour

HEAD SERVICE DESK PERSON PART TIME:   50¢ per hour

P/T NIGHT & EARLY MORNING STOCKING DIFFERENTIAL (After 11:00 PM and before 7:00 AM)    75¢ per hour

Night premium for all employees except grocery night stockers, full-time floor cleaners and full-time or part-time night cleaners listed as part-time store Employees, who work more than two (2) consecutive hours between the hours of 11:00 p.m. and 7:00 a.m. shall receive 75 cents per hour premium for all hours worked between 11:00 p.m. and 7:00 a.m.

Holiday, vacation, sick pay and funeral pay for full-time and part-time night stockers will be calculated on the basis of the regular rate plus night premium.

## STORE MAINTENANCE

The following general wage increases shall be granted to maintenance employees:

## GENERAL STORE MAINTENANCE

|  | 2004 ** | 2005 ** | 2006 ** | 2007 ** |
|---|---|---|---|---|
| Start | $15.50 | $15.50 | $15.50 | $15.50 |
| After 6 months | $20.80 | $20.80 | $20.80 | $20.80 |
| General Wage Increase | $0.305 | $0.305 | $0.305 | $0.305 |
|  | $0.320 | $0.320 | $0.320 | $0.320 |

## STORE MAINTENANCE REFIGERATION AND/OR ELECTRICAL

|  | 2004 ** | 2005 ** | 2006 ** | 2007 ** |
|---|---|---|---|---|
| Start | $16.50 | $16.50 | $16.50 | $16.50 |
| After 6 months | $21.80 | $21.80 | $21.80 | $21.80 |
| General Wage Increase | $0.305 | $0.305 | $0.305 | $0.305 |
|  | $0.320 | $0.320 | $0.320 | $0.320 |

|  | 2004 ** | 2005 ** | 2006 ** | 2007 ** |
|---|---|---|---|---|
| **LEAD MAINTENANCE** | $22.80 | $22.80 | $22.80 | $22.80 |
| General Wage Increase | $0.305 | $0.305 | $0.305 | $0.305 |
|  | $0.320 | $0.320 | $0.320 | $0.320 |

** - *First increase on 1st Sunday in August*
*Second increase on 1st Sunday in February*

All employees shall receive the highest rate of their classification (including all past general wage increase) upon the third year anniversary date of entering said classification and shall progress with additional general wage increase thereafter.

# U.S. District Court
## District of Rhode Island (Providence)
### CIVIL DOCKET FOR CASE #: 1:00-cv-00110-L

Boule, et al v. Shaw's Supermarkets
Assigned to: Judge Ronald R. Lagueux
Demand: $0
Cause: 29:1132 E.R.I.S.A.-Employee Benefits

Date Filed: 03/16/2000
Jury Demand: None
Nature of Suit: 791 Labor: E.R.I.S.A.
Jurisdiction: Federal Question

**Plaintiff**

**Marie T. Boule**

represented by **Betsy L. Ehrenberg**
Pyle, Rome, Lichten & Ehrenberg, P.C.
18 Tremont Street
Suite 500
Boston, MA 02108
617-367-7200
Fax: 367-4820
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James T. McCormick**
McKenna & McCormick
128 Dorrance Stret
Suite 330
Providence, RI 02903
831-2970
Fax: 751-1797
Email: mclaw@choicemail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Terence E. Coles**
Pyle, Rome & Lichten
90 Canal Street, 4th Floor
Boston, MA 02114
617-367-7200
Fax: 367-4820
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Warren H. Pyle**
Pyle, Rome, Lichten & Ehrenberg, P.C.
18 Tremont Street
Suite 500
Boston, MA 02108
617-367-7200
Fax: 367-4820
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Barbara A. Etchells**                          represented by  **Betsy L. Ehrenberg**
                                                 (See above for address)
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

                                                 **James T. McCormick**
                                                 (See above for address)
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

                                                 **Terence E. Coles**
                                                 (See above for address)
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

                                                 **Warren H. Pyle**
                                                 (See above for address)
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Denis Hartley**                                represented by  **Betsy L. Ehrenberg**
*individually, and as class representatives*     (See above for address)
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

                                                 **James T. McCormick**
                                                 (See above for address)
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

                                                 **Terence E. Coles**
                                                 (See above for address)
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

                                                 **Warren H. Pyle**
                                                 (See above for address)
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Local 791, United Food and Commercial**        represented by  **Betsy L. Ehrenberg**
**Workers Union**                                (See above for address)
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

                                                 **James T. McCormick**
                                                 (See above for address)
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

**Terence E. Coles**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Warren H. Pyle**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Shaw's Supermarkets, Inc.**                represented by   **Christa von der Luft**
Nutter, McClennen & Fish, LLP
155 Seaport Boulevard
World Trade Center West
Boston, MA 02210
617-439-2000
Fax: 310-9551
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David C. Henderson**
Nutter, McClennen & Fish, LLP
One International Place
Boston, MA 02110-2699
617 439-2000
Fax: 973-9748
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew F. Medeiros**
Little, Medeiros, Kinder, Bulman & Whitney
72 Pine St.
5th Floor
Providence, RI 02903
272-8080
Fax: 521-3555
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/16/2000 | 1 | COMPLAINT filed; FILING FEE $ 150.00 RECEIPT # 44336 (McCabe, F) (Entered: 03/16/2000) |
| 03/16/2000 | | CASE assigned to Judge Ronald R. Lagueux . Assigned to Magistrate Judge Lovegreen (McCabe, F) (Entered: 03/16/2000) |
| 03/16/2000 | 2 | MOTION by Marie T. Boule, Barbara A. Etchells, Denis Hartley, Local 791 for Preliminary Injunction (McCabe, F) (Entered: 03/16/2000) |

| 03/17/2000 | 3 | MOTION by Marie T. Boule, Barbara A. Etchells, Denis Hartley for Temporary Restraining Order (Barletta, B) (Entered: 03/21/2000) |
| 03/20/2000 | 5 | ENTRY of appearance for Shaw's Supermarkets by Matthew F. Medeiros (Barletta, B) (Entered: 03/21/2000) |
| 03/20/2000 | 6 | OBJECTION by Shaw's Supermarkets to [3-1] motion for Temporary Restraining Order (Barletta, B) (Entered: 03/21/2000) |
| 03/21/2000 |  | In-chambers conference set at 10:00 3/21/00 Before Judge Ronald R. Lagueux (Gilfillan, B) (Entered: 03/21/2000) |
| 03/21/2000 |  | In-chambers conference held; Mr. McCormick, Ms. Ehrenberg/Coles for plaintiffs; Mr. Medeiros/Mr. Henderson, Watson and Ms. Vonderluft for defendants; TRO denied; P/I hearing scheduled for 3/29/00 at 10:00 am (Gilfillan, B) (Entered: 03/21/2000) |
| 03/21/2000 |  | Motion hearing re: [2-1] motion for Preliminary Injunction at 10:00 3/29/00 (Gilfillan, B) (Entered: 03/21/2000) |
| 03/21/2000 | 4 | ORDER denying [3-1] motion for Temporary Restraining Order ( signed by Judge Ronald R. Lagueux ) (Gilfillan, B) (Entered: 03/21/2000) |
| 03/21/2000 | 7 | AFFIDAVIT by Eric Nadworny Re: [6-1] motion response (Barletta, B) (Entered: 03/21/2000) |
| 03/21/2000 | 8 | AFFIDAVIT by Hugh Penney Re: [6-1] motion response (Barletta, B) (Entered: 03/21/2000) |
| 03/21/2000 | 9 | MOTION by Marie T. Boule, Barbara A. Etchells, Denis Hartley, Local 791 for Terence E. Coles to Appear Pro Hac Vice (Barletta, B) (Entered: 03/21/2000) |
| 03/21/2000 | 10 | MOTION by Marie T. Boule, Barbara A. Etchells, Denis Hartley, Local 791 for Betsy Ehrenberg to Appear Pro Hac Vice (Barletta, B) (Entered: 03/21/2000) |
| 03/22/2000 | 11 | ORDER granting [10-1] motion for Betsy Ehrenberg to Appear Pro Hac Vice, granting [9-1] motion for Terence E. Coles to Appear Pro Hac Vice ( signed by Judge Ronald R. Lagueux ) (Gilfillan, B) (Entered: 03/22/2000) |
| 03/23/2000 | 12 | NOTICE by Shaw's Supermarkets to take deposition of London Health Administrators on 3/24/00 at 9:00 AM. (Barletta, B) (Entered: 03/23/2000) |
| 03/24/2000 | 13 | SUBPOENA Returned Subpoena served on London Health Administrators (Barletta, B) (Entered: 03/24/2000) |
| 03/24/2000 | 14 | MOTION by Shaw's Supermarkets for David C. Henderson to Appear Pro Hac Vice (Barletta, B) (Entered: 03/24/2000) |
| 03/24/2000 | 15 | ORDER granting [14-1] motion for David C. Henderson to Appear Pro Hac Vice ( signed by Judge Ronald R. Lagueux ) (Gilfillan, B) (Entered: 03/24/2000) |
| 03/27/2000 | 16 | MOTION by Shaw's Supermarkets for Christa von der Luft to Appear Pro Hac Vice (Barletta, B) (Entered: 03/27/2000) |
| 03/27/2000 | 17 | MOTION by Marie T. Boule, Barbara A. Etchells, Denis Hartley, Local 791 for Leave to File supplemental brief in support of their M/preliminary Injunction (Barletta, B) (Entered: 03/28/2000) |
| 03/28/2000 | 18 | OBJECTION by Shaw's Supermarkets to [2-1] motion for Preliminary Injunction (Barletta, B) (Entered: 03/28/2000) |

| 03/28/2000 | 19 | ORDER granting [16-1] motion for Christa von der Luft to Appear Pro Hac Vice ( signed by Judge Ronald R. Lagueux ) (Gilfillan, B) (Entered: 03/28/2000) |
| 03/29/2000 | 20 | MOTION by Marie T. Boule, Barbara A. Etchells, Denis Hartley, Local 791 for Warren H. Pyle to Appear Pro Hac Vice (Barletta, B) (Entered: 03/29/2000) |
| 03/29/2000 |  | Motion hearing re: [2-1] motion for Preliminary Injunction Motion hearing held. Crtrpt: J. Fontes. James McCormick, Warren Pyle, Betsy Ehrenberg and Terrence Coles for pltfs; Matthew Medeiros, David Henderson and Christa von der Luft for deft. Mr. Pyle and Mr. Henderson give opening statements. Oath is administered to 3 witnesses. DX by Pyle and Ehrenberg; CX by Henderson. 10 exhibits entered and marked full; 7 exhibits marked for ID. Court recesses to 3/30/00 at 2:00 PM. (Barletta, B) (Entered: 03/30/2000) |
| 03/29/2000 | 24 | ORDER granting [20-1] motion for Warren H. Pyle to Appear Pro Hac Vice ( signed by Judge Ronald R. Lagueux ) (Barletta, B) (Entered: 04/03/2000) |
| 03/30/2000 | 21 | TRANSCRIPT OF for dates of 3/29/00 (Barletta, B) (Entered: 03/30/2000) |
| 03/30/2000 |  | Motion hearing re: [2-1] motion for Preliminary Injunction. Crtrpt: J. Fontes. J. McCormick, B. Ehrenberg, T. Coles and W. Pyle for pltf; M. Medeiros; D. Henderson and C. von der Luft for deft. Cont'd DX of witness by Ehrenberg. Two exhibits marked for ID. Court recesses to 3/31/00 at 10:00 AM. (Barletta, B) (Entered: 03/31/2000) |
| 03/31/2000 |  | Filing fee for appearance pro hac vice of David Henderson; $50.00 Receipt #44428. (Barletta, B) (Entered: 03/31/2000) |
| 03/31/2000 |  | Filing fee for appearance pro hac vice of Christa von der Luft; $50.00; Receipt #44427. (Barletta, B) (Entered: 03/31/2000) |
| 03/31/2000 |  | Motion hearing re: [2-1] motion for Preliminary Injunction. Crtrpt: J. Fontes. J. McCormick, B. Ehrenberg, T. Coles and W. Pyle for pltf; M. Medeiros, D. Henderson and C. von der Luft for deft. Pltf. presents stipulation marking exhibit previously marked for ID as full. Oath is administered to 9 additional witnesses. Pltf. rests. 3 exhibits marked full; 1 exhibit marked for ID. Court recesses to 4/3/00 at 10:15 AM. (Barletta, B) Modified on 04/03/2000 (Entered: 04/03/2000) |
| 04/03/2000 | 22 | TRANSCRIPT OF for dates of 3/30/00 (Barletta, B) (Entered: 04/03/2000) |
| 04/03/2000 | 23 | TRANSCRIPT OF for dates of 3/31/00 (Barletta, B) (Entered: 04/03/2000) |
| 04/03/2000 | 25 | ORDER denying [2-1] motion for Preliminary Injunction ( signed by Judge Ronald R. Lagueux ) (Barletta, B) (Entered: 04/03/2000) |
| 04/03/2000 |  | Motion hearing re: [2-1] motion for Preliminary Injunction. Crtrpt: J. Fontes. J. McCormick; B. Ehrenberg; W. Pyle for pltf; M. Medeiros, C. von der Luft, D. Henderson for deft. Cont'd DX, CX, RDX & RCX of witness. Deft. rests. Ms. Ehrenberg and Mr. Henderson argue Motion. Court denies Motion and will so endorse on the papers. (Barletta, B) (Entered: 04/03/2000) |
| 04/03/2000 | 26 | Minute entry: Re: Hearing on M/Preliminary Injunction (Barletta, B) (Entered: 04/03/2000) |
| 04/04/2000 | 27 | TRANSCRIPT OF for dates of 4/3/00 (Barletta, B) (Entered: 04/05/2000) |
| 04/17/2000 |  | Filing fee received for appearance of Warren Pyle pro hac vice; $50.00; Receipt #44582 (Barletta, B) (Entered: 04/17/2000) |
| 08/09/2000 | 28 | MOTION by Marie T. Boule, Barbara A. Etchells, Denis Hartley, Local 791 to Stay |

| | | (Barletta, B) (Entered: 08/14/2000) |
|---|---|---|
| 08/25/2000 | 29 | ORDER granting [28-1] motion to Stay until 11/15/00 ( signed by Judge Ronald R. Lagueux ) (Gilfillan, B) (Entered: 08/25/2000) |
| 11/27/2000 | 30 | STIPULATION of dismissal signed by Judge Ronald R. Lagueux (Gilfillan, B) (Entered: 11/27/2000) |
| 11/27/2000 | | Case closed (Gilfillan, B) (Entered: 11/27/2000) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 02/17/2006 14:46:03 | | |
| **PACER Login:** | pr0222 | **Client Code:** | UFCW 791 |
| **Description:** | Docket Report | **Search Criteria:** | 1:00-cv-00110-L |
| **Billable Pages:** | 3 | **Cost:** | 0.24 |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

LOCAL 791, UNITED FOOD AND
COMMERCIAL WORKERS UNION,
    Plaintiff,

v.

SHAW'S SUPERMARKETS, INC.,
    Defendant.

Civil Action No. 05-10841-RCL

## AFFIDAVIT OF MARY McCLAY

I, Mary McClay, being duly sworn, depose and state as follows:

1.     I am a resident of Bridgewater, Massachusetts.

2.     I currently hold the position of Director of Grievance and Arbitration for Local 791, United Food and Commercial Workers Union ("Union"). I have held that position since August 1, 1998.

3.     Prior to holding the position of Director of Grievance and Arbitration, I held the following positions in the Union:. Union Organizer (1992-1998), Union Office Secretary (1987-1992), Executive Board Member (1983-1992).

4.     As the Secretary of the Union in 1991, I attended the collective bargaining negotiations between the Union and Shaw's Supermarkets, Inc. (the "Company"). Part of my responsibilities during negotiations was to take notes of what the parties communicated to each other during bargaining sessions.

5.    During the 1991 negotiations, the Union proposed including portions of the 1982, 1985 and 1988 Side Letters of Agreement (the "Side Letters") into the collective bargaining agreement. Prior to this, the Side Letters were not printed in the parties' collective bargaining agreement.

6.    In response, the Company agreed to include portions of the Side Letters into the collective bargaining agreement, but only if the Union agreed to the following provisional language:

The following 1982, 1985, 1988 understandings are hereby continued but shall not be subject to arbitration.

7.    The Union agreed to the Company's proposal and the Side Letters were incorporated, along with the language set forth in paragraph 6. These terms remain in the parties' collective bargaining agreement to this day.

8.    During the 1991 negotiations, the Company never suggested that its proposed language prohibiting arbitration of the Side Letters would prohibit either party from bringing a violation of the Side Letters as an action in federal court. The Company never suggested that its proposed language would only allow the parties to raise the matter through a grievance and no where else. The Union believed that the Company's proposed language only meant that the parties would be unable to arbitrate violations of the Side Letters.

9.    The Union never would have agreed to the Company's proposed language if it had meant that the parties were unable to bring a violation of the Side Letters in a breach of contract claim in federal court. The parties' grievance procedure, contained in Article 13 of the collective bargaining

agreement, concludes prior to arbitration at Step 3 (a response to the grievance from the Company's labor relations representative). The Side Letters contain a number of important provisions, including time off for stewards to attend union business and the requirement that the Company post job vacancies, that the Union would not have agreed to include in the parties' agreement if it meant it was prohibited from bringing a lawsuit for breach of the agreement after receiving a response to the grievance from the Company's labor relations representative.

10.     At the time the parties agreed to incorporate portions of the Side Letters into the Agreement, along with the prohibition on arbitrating the provisions of the Side Letters, the parties already had negotiated the health and welfare provisions in Article 10 of the parties' Agreement. This article includes a section prohibiting the parties from grieving and arbitrating violations of Article 10. The Company has never suggested that this provision prohibited either party from bringing a lawsuit violations of the health and welfare provisions contained therein.

Signed under pains and penalties of perjury this 21st day of February, 2006.


_____

Mary McClay